# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| MICA ALEXANDER MARTINEZ, | ) | |
| | ) | |
| Petitioner/Appellant, | ) | |
| v. | ) | **Case No. 23-6001** |
| | ) | |
| CHRISTE QUICK, Warden, | ) | **DEATH PENALTY CASE** |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent/Appellee. | ) | |

On Appeal from the United States District Court
for the Western District of Oklahoma

The Honorable Timothy D. DeGiusti
District Court No. CIV-16-1278-D

## OPENING BRIEF OF PETITIONER/APPELLANT

## ORAL ARGUMENT IS REQUESTED

KATRINA CONRAD-LEGLER, OBA No. 16953
BRENDAN VAN WINKLE, SC Bar No. 104768
VICKI WERNEKE, OBA No. 13441
Assistant Federal Public Defenders
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102
(405)609-5975 – Telephone
(405)609-5976 – Facsimile
Katrina_Legler@fd.org
Brendan_VanWinkle@fd.org
Vicki_Werneke@fd.org
ATTORNEYS FOR APPELLANT
MICA ALEXANDER MARTINEZ

March 1, 2024

# TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………………….ii

TABLE OF ATTACHMENTS ………………………………………...……iv

TABLE OF AUTHORITIES ………………………………………………....v

GLOSSARY OF ABBREVIATIONS TO RECORD REFERENCES …………...xi

PRIOR OR RELATED APPEALS ………………………………………………xi

JURISDICTION ………………………………………………………………...1

STATEMENT OF THE ISSUES ………………………………………………….2

STATEMENT OF THE CASE …………………………………………………….2

STATEMENT OF THE FACTS ………………………………………………….3

SUMMARY OF ARGUMENT ……….…………………………………………...8

STANDARD OF REVIEW …………………………………………….……....9

ARGUMENT ………………………………………………………………..11

PROPOSITION ONE ……………………………………………………….....11

COUNSEL WERE INEFFECTIVE AT MARTINEZ'S SENTENCING
HEARING FOR NOT ADEQUATELY INVESTIGATING AND
PRESENTING HIS MOTHER, GRANDFATHER, AND UNCLE ……...11

A. AEDPA's Legal and Factual Restriction Do Not Apply to the
Prejudice Prong …………………………………………………….14

B. The District Court Erred by Not Focusing "Exclusively on the
Actual Reasons Given" by the State Court ……………………...17

C. OCCA Unreasonably Applied *Strickland*'s Performance Prong...19

1. When Considering Counsel's Performance, OCCA Ignored *Strickland*'s Principal Concern ………………………………20

2. Counsel Did Not Conduct a Full Investigation, and They Presented a Poorly Investigated Defense ……………………24

3. Counsel Did Not Pursue Reasonable Investigative Leads …..28

4. Counsel's Performance Contravened Prevailing Professional Norms …………………………………………………..32

5. Counsel's Investigation into Martinez's Upbringing and Mental Health Lacked Due Diligence ………………………37

D. OCCA's Factual Determinations Supporting Its Decision on Counsel's Performance Were Unreasonable ……………………43

E. The District Court Erred by Finding That OCCA's Performance Holding Was Reasonable ………………………………………..47

F. Trial Counsel Were Ineffective for Failing to Adequately Investigate and Present Martinez's Mother, Grandfather, and Uncle as Mitigation Witnesses …………………………………..49

1. Counsel Performed Deficiently by Not Adequately Investigating and Presenting Martinez's Mother, Grandfather, and Uncle ………………………………………50

2. Counsel's Deficient Performance Prejudiced Martinez ……..55

a. The State Filed to Prove All the Aggravators …………....57

b. Counsel Presented a Superficially Reasonable Mitigation Theory ………………………………………………………58

c. When the Evidence is Reweighed, There is a Reasonable Probability that One Juror Would Change Her Vote to Life…………………………………….......................59

    G. At Minimum, This Court Should Remand for an Evidentiary
       Hearing …………………………………………………………..63

PROPOSITION TWO …………………………………………………….........66

    THE INTRODUCTION OF AN IRRELEVANT AND INFLAMMATORY
    RACIAL SLUR DEPRIVED MARTINEZ OF A RELIABLE
    SENTENCING HEARING …………………………………………………..66

    A. The State Provoked Its Witness to Use a Racial Slur ………………….67

    B. OCCA Did Not Adjudicate the Eighth Amendment Claim; Hence, This
       Court's Review is De Novo …………………………………………70

    C. Alternatively, OCCA's Decision Was Objectively Unreasonable ……..73

      1. OCCA's Decision Was Contrary to *Caldwell* ………………………73

      2. OCCA's Decision Was Based on an Unreasonable Determination
        of Facts ………………………………………………………………...75

    D. Martinez's Fair-Trial Claim Properly Relied on *Caldwell* and
       *Woodson* …………………………………………………………..77

PROPOSITION THREE ………………………………………………….........82

CONCLUSION …………………………………………………………………..84

Certificate of Digital Submission …………………………………………...85

Certificate of Compliance ………………………………………………………..85

Certificate of Service ………………..…………………………………………...86

## ATTACHMENTS

Attachment A -     Memorandum Opinion and Judgment of December 6, 2022, Case
                  No. CIV-16-1278-D

## TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT

*Andrus v. Texas*, 140 S. Ct. 1875 (2020) ……………………………..24, 30, 35, 64

*Bobby v. Van Hook*, 558 U.S. 4 (2009) …………………………………………..36

*Boyde v. California*, 494 U.S. 370 (1990) …………………………………….…37

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) …………………………………11, 83

*Brown v. Davenport*, 596 U.S. 118 …………………………………………….10

*Brumfield v. Cain*, 576 U.S. 305 (2015) ……………………………….………...15

*Bruton v. United States*, 391 U.S. 123 (1968) ……………………………......82

*Buck v. Davis*, 137 S. Ct. 759 (2017) …………………………………….….......82

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ……………………….……73-74, 77

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ……………………………...15-16, 66

*Dawson v. Delaware*, 503 U.S. 159 (1992) ……………………………70, 72-74

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ………………………………….....60

*Harrington v. Richter*, 562 U.S. 86 (2011) ……………………………….....10, 72

*Johnson v. Williams*, 568 U.S. 289 (2013) ……………………………………72

*Kansas v. Carr*, 577 U.S. 108 (2016) ……………………………………….........76

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) …………………………………19

*Martinez v. Ryan*, 566 U.S. 1 (2012) …………………………………………..11

*McClesky v. Kemp*, 481 U.S. 279 (1987) …………………………………………79

*Miller-El v. Dretke,* 545 U.S. 231 (2005) …………………………………………...10

*O'Neal v. McAninch*, 513 U.S. 432 (1995) …………………………………….10, 84

*Padilla v. Kentucky*, 559 U.S. 356 (2010) …………………………..………..12, 32

*Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017) …………………….……..80

*Porter v. McCollum*, 558 U.S. 30 (2009) ……………………………12, 24, 36, 64

*Romano v. Oklahoma*, 512 U.S. 1 (1994) ………………………………….……..76

*Rompilla v. Beard*, 545 U.S. 374 (2005) ……..12, 15, 19, 22, 24, 33, 36, 56, 64, 71

*Roper v. Simmons*, 543 U.S. 551 (2005) …………………………………...…23

*Rose v. Mitchell*, 443 U.S. 545 (1979) …………………………………………82

*Sears v. Upton*, 561 U.S. 945 (2010) ……………………..24, 36, 45, 49, 56-57, 64

*Shinn v. Kayer*, 592 U.S. 111 (2020) …………………………………………..15

*Simmons v. South Carolina*, 512 U.S. 154 (1994) …………….………………..82

*Skipper v. South Carolina*, 476 U.S. 1 (1986) …………………………......…58

*Strickland v. Washington*, 466 U.S. 668 (1984) ……...1, 10-11, 13, 19-24, 32, 36-37, 44-46, 49, 55-56, 64-65, 71

*Tafflin v. Levitt*, 493 U.S. 455 (1990) ……………………………….....……63-64

*Watts v. Indiana*, 338 U.S. 49 (1949) ………………………………………….28

*Wiggins v. Smith*, 539 U.S. 510 (2003) …………......………12, 18, 20-22, 24, 33-34, 36, 45-48, 56, 58, 64

*Williams (Terry) v. Taylor*, 529 U.S. 362 (2000) …………….....…12, 19, 24, 36, 64

*Williams (Michael) v. Taylor*, 529 U.S. 420 (2000) ……………….....……..16, 65

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) ……………………..……………17, 19

*Wong v. Belmontes*, 558 U.S. 15 (2009) …………………………………………57

*Woodson v. North Carolina*, 428 U.S. 280 (1976) …………...………...66, 74, 77

## FEDERAL CASES

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) ……………..…11-12, 22, 33

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) ………………………21, 65

*Calhoun v. United States*, 478 F.Appx. 193 (5th Cir. 2012) ………...……..……..79

*Cargle v. Mullin,* 317 F.3d 1196 (10th Cir. 2003) ………………………..10, 65, 83

*Daso v. Grafton Sch., Inc.*, 181 F.Supp. 2d 485 (D. Md. 2002) ……………..……81

*Drouillard v. Sprint/United Mgmt. Co.*, 375 F.Supp. 3d 245 (E.D.N.Y. 2019) ….81

*Dutton v. Brown*, 812 F.2d 593 (10th Cir. 1987) …………………………………35

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002) …………………………………65

*Frederick v. Quick*, 79 F.4th 1090 (10th Cir. 2023) …………………………14, 50

*Graham v. White*, ___ F.Supp.3d ___, No. 23-CV-0164-CVE-SH,
    2023 WL 4141662 (N.D. Okla. June 22, 2023) …………………………..…73

*Hanson v. Sherrod*, 797 F.3d 810 (10th Cir. 2015) ………………………..……..83

*Harris v. Sharp*, 941 F.3d 962 (10th Cir. 2019) ……..……15-17, 19, 49, 57, 65-66

*Holland v. Allbaugh*, 824 F.3d 1222 (10th Cir. 2016) ……………………….……11

*Honie v. Powell*, 58 F.4th 1173 (10th Cir. 2023) …..………………………………77

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) …………………….16, 28, 65

*Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002) ………………………………65

*James v. Ryan*, 733 F.3d 911 (9th Cir. 2013) ………………………………………72

*Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017) …………………….....……….14

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) …...12, 16, 19, 22, 28, 65-66

*Mason v. SEPTA*, 134 F.Supp. 3d 868 (E.D. Pa. 2015) ………….…………….81

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) …….…………..81

*Meek v. Martin*, 74 F.4th 1223 (10th Cir. 2023) ……………….....15, 17, 43, 47, 63

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) …..…81

*Postelle v. Carpenter*, 901 F.3d 1202 (10th Cir. 2018) ………………………38, 43

*Prendergast v. Clements*, 699 F.3d 1182 (10th Cir. 2012) …………………….77

*Saiz v. Ortiz*, 392 F.3d 1166 (10th Cir. 2004) …………………....…………….....9

*Simon v. Epps*, 344 F. App'x 69 (5th Cir. 2009) …………………………………36

*Smith v. Aldridge*, 904 F.3d 874 (10th Cir. 2018) ………………….....………...44

*Smith (Michael) v. Duckworth*, 824 F.3d 1233 (10th Cir. 2016) …………..……...44

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) …………………....…….12, 65

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001) …………………81

*Thomas v. Bronco Oilfield Servs.*, 503 F.Supp. 3d 276 (W.D. Pa. 2020) ……… 80

*United States v. Antonelli Fireworks Co.*, 155 F.2d 631 (2d Cir. 1946) ……......80

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 201) ………....……….…….33

*United States v. Gantt*, 679 F.3d 1240 (10th Cir. 2012) …………………….…….9

*United States v. Leffler*, 942 F.3d 1192 (10th Cir. 2019) ………….…..….……47

*United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014) ……….…………..…..74

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) …………………12, 19, 25, 42

*Young v. Sirmons*, 486 F.3d 655 (10th Cir. 2007) ……………………………….22

## STATE CASES

*Coddington v. State*, 142 P.3d 437 (Okla. Crim. App. 2006) ……………….........35

*Malone v. State*, 168 P.3d 185 (Okla. Crim. App. 2007) ……………………...…13

*Martinez v. McCall*, MA-2012-458 (Okla. Crim. App. 2012) …………………….6

*Martinez v. State*, 371 P.3d 1100 (Okla. Crim. App. 2016) …..…….3, 57-58, 70-71, 73-76, 82

*Martinez v. State*, PCD-2013-936 (Okla. Crim. App. May 5, 2016) ..……..3, 16, 65

*Martinez v. State*, PCD-2017-951 (Okla. Crim. App. Sept. 15, 2017) ……..…16, 65

*Simpson v. State*, 230 P.3d 888 (Okla. Crim. App. 2010) ………………………..20

*Warner v. State*, 29 P.3d 569 (Okla. Crim. App. 2001) ………………………….35

## DOCKETED CASES

*Martinez v. Quick*, No. 23-6001 (June 29, 2023) ………………..……………..1

## FEDERAL STATUTES

28 U.S.C. § 1291 ………………...……………………………...…………1

28 U.S.C. § 2253 ………..…...………………..…………………………1

28 U.S.C. § 2254 …………......…………..9-10, 15-16, 18, 43-44, 48, 65-66, 73, 75

42 U.S.C. § 4541 …...……………….…………………………………..25

## STATE STATUTES

Okla. Stat. tit. 22 § 701.11 ……………………..…………………………...………56

## MISCELLANEOUS AUTHORITIES

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (1980) ……………………………..……………………33

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 11.4.1(C) (1989) …………………………………..…….…33, 34

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003) ………………………………….…33, 37-38, 43

*ABA Standards for Criminal Justice* 4-4.1, 4-54 (2d ed. 1980) ………………….33

*Annual Report of the Commissioner of Indian Affairs to the Secretary of Interior* 392 (1904) ……………………………………………………………………………...60

Bator, Paul, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441 (1963) ………………….…………………...64-65

Blume, John and Russell Stetler, *Mitigation Matters* in *Tell the Client's Story: Mitigation in Criminal and Death Penalty Cases*, by Edward C. Monhahan, James C. Clark, ABA Book Publishing (2017) ………………………….………………...39

Stetler, Russel, and Aurélie Tabuteau, *The ABA Guidelines: A Historical Perspective*, 43 Hofstra L. Rev. 731 (2015) …………………….…..……………....33

Sundby, Scott E., *The Jury As Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (1997) ………..38-39, 40

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677 (2008) ………………………………...…34

Vidmar, N. and R. Schuller, *Juries and Expert Evidence: Social Framework Testimony*, 52 Law & Contemp. Probs. 133 (1989) …………………………..38-39

## <u>GLOSSARY OF ABBREVIATIONS TO RECORD REFERENCES</u>

ROA        Record on Appeal (filings in the federal district court (Vol. I-IV) followed by page number);

OR        Five-volume consecutively paginated Original Record in Comanche County Case No. CF-2009-473, followed by page number;

Tr.        Twelve-volume jury trial held June 3-June 18, 2013, CF-2009-473, followed by volume number and page number;

M.Tr.        Motion Hearing transcripts followed by date and page number;

APCR        Application for Post-Conviction Relief, *Martinez v. State*, PCD-2013-936.

## <u>PRIOR OR RELATED APPEALS</u>

There are no prior or related appeals to this Court.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

MICA ALEXANDER MARTINEZ,  )
                                )
      Petitioner/Appellant,  )
                                )
v.                           )    Case No. 23-6001
                                )
CHRISTE QUICK, Warden,  )    (Capital Case)
Oklahoma State Penitentiary,  )
                                )
      Respondent/Appellee.  )

---

**OPENING BRIEF OF PETITIONER/APPELLANT
MICA ALEXANDER MARTINEZ**

---

**ORAL ARGUMENT IS REQUESTED**

---

### JURISDICTION

Mica Alexander Martinez timely filed his habeas petition on September 15, 2017. ROA II at 4. The district court denied relief and a certificate of appealability (COA) on all grounds in its Memorandum Opinion and Judgment on December 6, 2022, Case No. CIV-16-1278-D (Attachment A). ROA I at 638, 678. Judge Michael Murphy granted a COA on three grounds. *See* Order, *Martinez v. Quick*, No. 23-6001 (June 29, 2023). Martinez sought to modify the COA to include the denial of an evidentiary hearing on his certified *Strickland* claim, which the Court granted. *See* Motion, *Martinez v. Quick*, No. 23-6001 (July 10, 2023); Order, *Martinez v. Quick*, No. 23-6001 (July 12, 2023). This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

1

## STATEMENT OF THE ISSUES

The district court erred in denying relief on the following claims:

1. Counsel were ineffective at Martinez's sentencing for failing to adequately investigate and present his mother, grandfather, and uncle.

2. The introduction of an irrelevant and inflammatory racial slur deprived Martinez of a reliable sentencing hearing.

3. The cumulative effect of the errors prejudiced Martinez.

## STATEMENT OF THE CASE

On October 19, 2009, Martinez was charged in Comanche County for murdering Martha and Carl Miller and assaulting their son Shawn Monk. OR I at 23-25. The State sought the death penalty, alleging three aggravating factors: 1) the defendant knowingly created a great risk of death to more than one person; 2) the murder was especially heinous, atrocious, or cruel; and 3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. OR I at 5.

After four days of trial, the jury convicted Martinez on all counts. Tr. IX at 52-53. The penalty phase started the following day and lasted three days, including one day solely for closing arguments and juror deliberations. Tr. XII at 2. The jury found two aggravating circumstances for each murder: 1) the defendant created a great risk of death to more than one person, and 2) the murder was especially heinous, atrocious, or cruel. OR V at 874, 879. It did not find that Martinez was a

2

continuing threat. *Id*. The jury assessed two verdicts of death on June 18, 2013. Tr. XII at 31-32; OR V at 898-900.

Martinez's convictions and sentences were affirmed on direct appeal. *Martinez v. State*, 371 P.3d 1100 (Okla. Crim. App. 2016). The Oklahoma Court of Criminal Appeals (OCCA) denied postconviction relief and denied Martinez's request for an evidentiary hearing. *Martinez v. State*, Case No. PCD-2013-936 (Okla. Crim. App. May 5, 2016); ROA II at 119-131. Martinez then sought federal habeas relief. ROA II at 4. The United States District Court for the Western District of Oklahoma granted Martinez's motion for discovery and a hearing on a juror misconduct claim. ROA I at 379-391, 584. On December 6, 2022, the district court denied habeas relief, discovery, and a certificate of appealability. ROA I at 638-679.

## STATEMENT OF THE FACTS

In the early morning hours of October 12, 2009, Mica Martinez entered the home of Carl and Martha Miller and brutally beat Carl in the garage and Martha in her bedroom. Tr. VI at 48, 57-58, 71. Mr. and Mrs. Miller succumbed to their injuries and passed away. *Id*. at 83. Earlier in the morning, Martinez asked his grandfather, Marty Martinez, if he could borrow one of his firearms to go "hog hunting." *Id*. at 203-204. Marty lent Martinez a gun and told him where to find the ammunition. Tr. VI at 203. Around 3:30 a.m., Martinez arrived unannounced at his friend Bradley Payne's home. *Id*. at 211. Martinez asked Bradley Payne to join him in a hog hunt,

3

which Payne declined. *Id*. at 214. Payne's brother Daniel testified that Martinez had woken him up. Daniel smelled alcohol and knew Martinez had been drinking. Tr. VIII at 12.

Within a few hours of Martinez leaving the Payne brothers' house, the Comanche County emergency dispatch began receiving 911 calls. Tr. VI at 48; St. Ex. 1. The first call came in at 4:59 a.m. from Martha Miller, in which she reported gunshots and a car with its headlights on was stopped by her house. Tr. VI at 47-48, St. Ex. 1. Another call came in at 5:38 a.m. from Shawn Monk, Martha Miller's son, reporting that his parents had been beaten and an intruder was in their house. Tr. VI 48; St. Ex. 1.

Monk had been sleeping in the back bedroom of his parents' house when he awoke to loud voices. *Id*. at 55. He heard a man's voice saying things like, "Where's the money, bitch?" and soon realized it was not the television. *Id*. at 56. Monk saw the intruder, eventually identified as Martinez, leaving his parents' bedroom for the living room. *Id*. at 61-62. As Monk passed his parents' bedroom, he saw his mother unclad from the waist down and bent over the bed, which was how the police found her. *Id*. at 58, 168-169. Monk's father was later found in the garage. *Id*. at 166-67.

Once seen, Monk and Martinez started fighting in the hallway and ended up in the kitchen. *Id*. at 59, 66. During the fight, Monk asked to call 911 to get help for his parents. Martinez agreed, and they stopped fighting. *Id*. at 60. While Monk was

4

on the 911 call, Martinez threw a hand-held barbell at him. *Id*. at 66. Monk and Martinez began fighting for possession of the gun lying on the floor and Martinez hit Monk over the head with the weapon several times. *Id.* The fight continued until police arrived. *Id*. at 70.

Law enforcement found a vehicle with the key in the "on" position, but the battery was dead. *Id*. at 105. Upon approaching the back door of the house, the officers could hear muffled yelling and what sounded like a fight. *Id*. at 109. Monk opened the door for the officers. *Id*. at 112. Martinez was leaning against a wall and eventually slid down the wall to the floor saying, "I'm sorry, I'm sorry, I'm sorry." *Id*. Both men were covered in blood. The kitchen was in disarray, and a rifle was lying on the floor. Tr. VI at 112, 115, 162-163. Deputy Kimmel, the first officer on the scene, smelled alcohol on Martinez and noticed he was slurring his words. *Id*. at 66.

Numerous changes in defense counsel, competency proceedings, and other delays pushed the start of trial to June 2013, four years after the offense. Over six different attorneys from the Oklahoma Indigent Defense System (OIDS) represented Martinez in pre-trial proceedings. As lawyers shuffled, they sought continuances, leading the trial court to become suspicious of gamesmanship. The judge was especially skeptical of the departure of Lynn Burch because it was so close to the start of the trial.

OIDS began proceedings to have the trial judge recused from the case because of a belief of judicial bias, eventually filing a petition for a writ of mandamus in OCCA. *See Martinez v. McCall*, MA-2012-458 (Okla. Crim. App. 2012). OCCA denied the writ, and OIDS withdrew from Martinez's case. OR IV at 679-683. OIDS appointed conflict attorneys Perry Hudson and Craig Corgan on December 18, 2012, which was after pre-trial motions were heard. OR I at 926, 930-31. The jury sentenced Martinez to death on June 18, six months after conflict counsel entered the case. OR IV at 679-683. Conflict counsel and attorney Burch met briefly at a mall to discuss the case. ROA II at 141-42. Burch did not remember the meeting. *Id*. at 301.

At trial, counsel presented a voluntary intoxication defense but abandoned its jury instruction directly before guilt-phase deliberations. Tr. IX at 5. Counsel presented the evidence entitling Martinez to an intoxication instruction, but they dropped the request because they feared confusing the jurors on the element of malice aforethought. *Id.* at 5.

Counsel continued with the intoxication narrative at sentencing, incorporating five witnesses from the guilt phase into the penalty phase. Tr. IX at 96-97. Two of the witnesses were Martinez's friends who testified Martinez seemed drunk hours before the offense. Tr. VIII at 4-19. Two witnesses were experts, a neuropsychologist and a neuropharmacologist. Tr. VIII at 19-109. Together, the

experts attempted to show that Martinez's chronic alcoholism damaged his brain and culminated with the offense. *Id*. Counsel incorporated a fifth witness from the State's presentation who said Martinez seemed drunk hours before the offense. Tr. VI at 210-224, XI at 96-97. In opening and closing statements at the penalty phase, trial counsel highlighted Martinez's drinking. Tr. XI at 6; Tr. XII at 8.

In response, the State presented testimony claiming Martinez was not that drunk on the night of the offense and he did not have a history of chronic alcohol abuse. Most powerfully, the State called three witnesses who testified to Martinez's drinking habits: Martinez's grandfather, Marty Martinez; the mother of his oldest child, Mary Carothers; and the mother of his other three children, Teresa Elam. Tr. VI at 204; Tr. X at 49, 58, 69. Each of these witnesses minimized Martinez's drinking and highlighted that Martinez became violent when he did drink. *Id*. at 38, 49, 70. The State also pointed to a blood test drawn thirteen hours after the offense which did not detect the presence of alcohol or drugs. Tr. VII at 87, 91-92, 101.

In addition to Martinez's drinking, the State asked Mary Carothers about an incident that occurred between Martinez and two men at a Taco Bell in Lawton. Tr. X at 51. The State elicited a racial slur from Carothers, that she claimed Martinez used during the incident. Tr. X at 53. The jury heard the testimony but was told to disregard it. *Id*.

Trial counsel also presented a life-history expert. The expert testified to the obstacles Martinez faced throughout his life, including health problems, suicide attempts, alcohol and drug use, and the passing of who he thought was his mother but was later revealed to be his grandmother. *Id*. at 24-43. The State stressed that most of her testimony was uncorroborated and much of it based on self-reported information from Martinez. *Id*. at 59-60; Tr. XII at 18-19, 22-23.

Martinez's aunt and two of his sons also testified. His children told the jury Martinez was a great father, and his aunt described Martinez's reaction to his grandmother's death and the minimal adult supervision he received afterward. *Id*. at 84-95, 103-104. Counsel also presented three guards who testified to Martinez's behavior while in custody. Tr. XI at 68-82, 114-18. In all, most of the defense's penalty-phase presentation was intoxication testimony incorporated from and presented during the guilt phase. *Compare* Tr. VI at 210-226, VIII at 4-110 (incorporated testimony) *with* Tr. XI at 14-118 (sentencing testimony).

## SUMMARY OF ARGUMENT

Martinez's counsel were ineffective by failing to complete basic and fundamental steps expected in all death penalty investigations. They failed to adequately investigate, develop, and present mitigating evidence of Martinez's background through his mother, grandfather, and uncle. On appeal, appellate counsel omitted this claim, but it was raised in state postconviction proceedings. Not only

was the investigation of the three witnesses required, but counsel's failure advanced a factual conflict between Martinez's family members and the expert witnesses. The conflict undermined counsel's credibility and led to counsel abandoning their primary defense of intoxication. In this shadow, counsel then presented Martinez's remaining witnesses.

Martinez's Eighth and Fourteenth Amendment rights to a fair sentencing proceeding and due process were further eroded by the introduction of a prejudicial and irrelevant racial slur that was neither connected to the offense, nor to the aggravating circumstances. Thus, the errors of ineffectiveness were worsened by the addition of improper and aggravating evidence. The errors cumulated and resulted in a penalty phase that did not align with constitutional requirements and a reliable capital sentencing.

## <u>STANDARD OF REVIEW</u>

This Court reviews "the district court's legal analysis of the state court decision de novo." *Saiz v. Ortiz*, 392 F.3d 1166, 1176 (10th Cir. 2004). If the district court's analysis depends entirely on the state record, the Court will review the state record independently. *Id*. The Court presumes the state court facts are correct, but the facts are rebuttable by clear and convincing evidence. 28 U.S.C. 2254(e)(1). If the district court made factual findings, they are reviewed for clear error. *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012).

9

The Court's review is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, when a state court has adjudicated a claim, the Court can reverse only if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). An unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When a claim is not adjudicated, the Court "is not constrained by the deference principles in § 2254(d)." *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003).

AEDPA's standards are "demanding but not insatiable" and "[d]eference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Once AEDPA is satisfied, the Court decides the merits of the claim. 28 U.S.C. § 2254(d). The Court grants relief if the error has a "substantial and injurious effect or influence" in determining the jury's verdict. *Brown v. Davenport*, 596 U.S. 118, 145 (2022). A substantial and injurious effect exists when the Court has a "grave doubt" about the errors' likely effect on the jury or finds itself in "virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435-36 (1995). An exception lies with *Strickland*. There, once prejudice is established, so too is the

10

harmless-error test in habeas proceedings. *Holland v. Allbaugh*, 824 F.3d 1222, 1230 (10th Cir. 2016). *Strickland* prejudice subsumes the *Brecht* standard. *Id.*

## ARGUMENT

Martinez raises three claims. The *Strickland* claim was originally raised in state postconviction proceedings in Martinez's original application for postconviction relief. ROA I at 139-147. OCCA denied relief, and the district court found that OCCA's decision was reasonable. ROA I at 648-651. The second claim arises from the use of a racial slur at Martinez's trial. This claim was originally raised in direct appeal. ROA I at 92-97; ROA II at 77-88. OCCA rejected the claim, and the district court found that decision reasonable. ROA I at 660-61. The third claim is cumulative error. It was raised in direct appeal and postconviction. ROA I at 116, 147-50; ROA II at 112-116. OCCA rejected the claim, which the district court found to be reasonable. ROA I at 676-677; ROA II at 129-130.

## PROPOSITION ONE

### COUNSEL WERE INEFFECTIVE AT MARTINEZ'S SENTENCING HEARING FOR NOT ADEQUATELY INVESTIGATING AND PRESENTING HIS MOTHER, GRANDFATHER, AND UNCLE.

The right to effective assistance of counsel is "a bedrock principle in our justice system" and the "foundation for our adversary system." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012). In death penalty cases, courts must be "'particularly vigilant' in ensuring the right to effective assistance of counsel." *Anderson v. Sirmons*, 476

11

F.3d 1131, 1141 (10th Cir. 2007) (quoting *Smith v. Mullin*, 379 F.3d 919, 938 (10th Cir. 2004)). At the time of Martinez's trial, "it is unquestioned" that counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *(Terry) Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

The depth of investigation required in a capital case is "necessarily linked to the practice and expectations of the legal community." *Padilla v. Kentucky*, 599 U.S. 356, 366 (2010). A reasonable investigation does not require counsel to "scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). But counsel are "obliged to follow up on leads that are readily identifiable in the evidence." *Littlejohn v. Trammell*, 704 F.3d 817, 862 (10th Cir. 2013). The Court's "principal concern" with attorney performance is not the presentation of mitigation but "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the client's] background *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (emphasis in original).

When the sentence is death, investigating "family members is hardly an onerous requirement, rather, it is the starting point for most investigation." *Wilson v. Sirmons*, 536 F.3d 1064, 1088 (10th Cir. 2008). Here, trial counsel never made it past the starting point. Reasonable counsel can strategically decide against further investigation into a client's family. But strategic decisions based on incomplete

12

investigation are reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691. Attorney conduct cannot be reasonable where witnesses are close family members, integral to the defense theory, readily available, and uninvestigated.

Martinez's counsel neglected the most basic and rudimentary steps expected in death penalty investigations: investigate the client's mother. From there, competent counsel investigates close family members. Not only are these steps intuitive, but their necessity to a reasonable investigation has long been acknowledged by the legal community. Trial counsel argued Martinez's chronic alcoholism and his drunkenness on the night of the offense prevented him from forming malice intent. Tr. VI at 37-38; VIII at 19-109. But counsel abandoned the intoxication instruction to avoid confusing the jury on the malice instruction. *See* Tr. IX at 5. The decision was made directly before deliberations, despite the comparison of the malice and intoxication instructions being a question of law that could have been considered and decided before trial. OR V at 821; *see Malone v. State*, 168 P.3d 185, 197-98 (Okla. Crim. App. 2007).

In any event, the damage was done, and the blow to counsel's credibility undermined the remaining mitigation. A reasonable investigation into Martinez's background would have exposed the complexities in the intoxication defense and allowed counsel to prepare for inconsistencies and better support and inform their

experts. Plus, a reasonable investigation into Martinez's family would have led to a stronger case for a sentence less than death.

Trial counsel's ineffectiveness should have been raised on appeal as ineffective assistance of trial counsel (IATC), but it was not. Martinez raised the claim as ineffective assistance of appellate counsel (IAAC) in postconviction proceedings. ROA I at 139-147. Appellate counsel are not required to raise every issue. *Frederick v. Quick*, 79 F.4th 1090, 1105 (10th Cir. 2023). But if trial counsel were ineffective, so too were appellate counsel for omitting the meritorious claim. *Id.* at 1105-06, 1106 n.4 (describing different ways to review IAAC claims). Thus, Martinez's IAAC claim predominantly focuses on trial counsel's performance and the resulting prejudice. *See id*.

## A. AEDPA's Legal and Factual Restrictions Do Not Apply to the Prejudice Prong.

Martinez's IAAC claim has two prongs, each with different procedural features and evidentiary landscapes. The two prongs are deficient performance and prejudice. *Frederick*, 79 F.4th at 1105-06. OCCA adjudicated the former but not the latter, and it denied Martinez an evidentiary hearing. ROA II at 127-29, 131. Because of these "unique procedural features," AEDPA restricts review of the performance prong but not the prejudice prong. *See Littlejohn v. Royal*, 875 F.3d 548, 554 (10th Cir. 2017). The Court reviews the merits of the performance prong only if AEDPA is satisfied, and its AEDPA review does not consider evidence outside the state

14

record. *Id*. Conversely, the Court reviews the prejudice prong de novo, and it considers the evidence before the district court, regardless of when and where it was presented. *Id*. The Court can also order factual development. *Id*.

Because it was adjudicated, Martinez must demonstrate that OCCA's application of the performance prong was unreasonable or relied on an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d). In this context, "unreasonable" means the state court ruling is "'so obviously wrong' that no reasonable judge could arrive at the same conclusion given the facts of the prisoner's case." *Meek v. Martin*, 74 F.4th 1223, 1248 (10th Cir. 2023) (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020)). The Court's review of counsel's performance is restricted to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); 28 U.S.C. § 2254(d)(2). If OCCA's performance ruling was unreasonable, the Court can then consider the evidence presented to the district court to determine the merits. *Harris v. Sharp*, 941 F.3d 962, 978 (10th Cir. 2019).

Without an adjudication, the Court's review of the prejudice prong is de novo. *See Rompilla*, 545 U.S. at 390; *Brumfield v. Cain*, 576 U.S. 305, 323 (2015). Thus, establishing prejudice requires nothing more than a "reasonable probability" that Martinez would have prevailed on direct appeal had appellate counsel rendered competent representation. *See Rompilla*, 545 U.S. at 390. A reasonable probability

of a different outcome is one where counsel's errors are "sufficient to undermine confidence in the outcome." *Id*. at 694.

As for the evidentiary landscape of the prejudice prong, the Court considers the evidence before both state and federal courts. *Littlejohn*, 704 F.3d at 857. Ordinarily, AEDPA forbids courts from looking beyond the state record. *Pinholster*, 563 U.S. at 181; 28 U.S.C. § 2254(d)(2). Not here. OCCA did not adjudicate the prejudice prong, so § 2254(d) does not apply. ROA I at 652; *see also Harris*, 941 F.3d at 975. Without § 2254(d), *Pinholster*'s evidentiary restrictions on § 2254(d)(1) do not apply, nor do the restrictions in the text of § 2254(d)(2). *Littlejohn*, 704 F.3d at 857; *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012).

And AEDPA ordinarily forbids petitioners from presenting new evidence in federal court. 28 U.S.C. § 2254(e)(2). Again, not here. *See* (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 437 (2000). The prohibition on new evidence applies when "the applicant has failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). But Martinez diligently tried to develop facts in state court, twice seeking an evidentiary hearing. Motion for Evidentiary Hearing, *Martinez v. State*, PCD-2013-936 (Okla. Crim. App. June 5, 2015); Motion for Evidentiary Hearing, *Martinez v. State*, PCD-2017-951 (Okla. Crim. App. Sept. 15, 2017). With each request, Martinez presented affidavits previewing the evidence he sought to develop at a hearing. *Id*. Martinez "did all that he could to develop the

16

factual foundation for a showing of prejudice." *Harris*, 941 F.3d at 983. OCCA denied both requests. ROA II at 131; ROA I at 188. Likewise, the district court denied Martinez's request for an evidentiary hearing on his IAAC claim. ROA I at 677.

### B. The District Court Erred by Not Focusing "Exclusively on the Actual Reasons Given" by the State Court.

When "sitting in habeas, the object of a federal court's focus is the state *court*'s ultimate *decision*." *Meek*, 74 F.4th at 1249 (emphasis in original). The federal court must "train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018). "This is a straightforward inquiry when," like here, "the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id*. at 1192. The "federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id*. OCCA explained its performance decision and gave reasons why Martinez's counsel performed adequately. ROA II at 127-29. So the district court's review should have "focused exclusively on the actual reasons given" by OCCA. *Wilson*, 138 S. Ct. at 1195.

OCCA denied Martinez's IAAC claim in six paragraphs. ROA II at 127-29. It held that trial counsel were not deficient because they had access to experts, presented expert and lay testimony, and gave detailed opening and closing

statements. *Id*. OCCA reasoned that expert access and a threshold number of witnesses insulate counsel from performance error. Its analysis focused almost entirely on the trial record, ignoring the dispositive issue of whether counsel's investigation "*was itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis in original). Only once did OCCA mention evidence outside the trial transcript. *Id*. at 10-11. There, the court noted that an investigator said counsel's failure to present Martinez's grandfather as a witness was based on strategy. *Id*.

Without distinguishing between §§ 2254(d)(1) and (2), the district court ruled that OCCA's decision was reasonable. ROA I at 648-651. It did so by providing its own reasoning, far outside OCCA's decision. *Compare* ROA I at 648-653 *with* ROA II at 127-29. Based on postconviction affidavits, the district court reasoned that counsel's failure to investigate Martinez's mother, grandfather, and uncle was not deficient because counsel could have "legitimately viewed testimony from these witnesses as duplicative, unhelpful, or fraught with risk." ROA I at 651. At no point did OCCA's decision mention the quality of these witnesses, their postconviction affidavits, or how the affidavits compared to trial testimony. ROA II at 127-29. Other than conclusory statements and general explanations of law, the only overlap between the district court's analysis and the reasons given by OCCA is the mention of the investigator who claimed counsel strategically decided against calling Martinez's grandfather as a witness. ROA II at 127-29; ROA I at 648-653.

Everything else in the district court's order was gratuitous and irrelevant under AEDPA. *See Wilson*, 138 S. Ct. at 1191-92.

### C. OCCA Unreasonably Applied *Strickland*'s Performance Prong.

To establish deficient performance, Martinez must show that counsel's performance "fell below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 687-88. The Court judges "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690. It makes "every effort to view the facts as a defense lawyer would have done at the time." *Rompilla*, 545 U.S. at 385. Counsel's performance is measured "under prevailing professional norms" and presumed reasonable. *Id*. at 688. In habeas, deference "exists both in the underlying constitutional test (*Strickland*) and the AEDPA's standard for habeas relief, creating a 'doubly deferential judicial review.'" *Harris*, 941 F.3d at 973 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

OCCA's holding contravened clearly established Supreme Court precedent on attorney performance in capital cases. *See (Terry) Williams*, 529 U.S. at 391. Derived from that precedent, this Court has set forth "three important principles." *Littlejohn*, 704 F.3d at 860 (quoting *Wilson v. Sirmons*, 536 F.3d 1064, 1084-85 (10th Cir. 2008)). The first principle is that "the question is not whether counsel did something; counsel must conduct a full investigation and pursue reasonable leads when they

become evident." *Id*. OCCA's holding and counsel's conduct violated the first principle in three related ways. First, OCCA focused almost exclusively on what counsel did at trial and never evaluated the underlying investigation. Second, counsel did not conduct a full investigation. And third, counsel did not pursue reasonable leads during their investigation.

The second principle is that the ABA guidelines serve as "reference points" to determine the prevailing norms at the time of counsel's conduct and evaluate the reasonableness of the conduct. *Id*. Lastly, because "of the crucial mitigating role that evidence of a poor upbringing or mental health problems can have in the sentencing phase," the third principle states that "defense counsel must pursue this avenue of investigation with due diligence." *Id*. (emphasis omitted).

Despite clear violations of each principle, OCCA held that counsel's performance was not deficient. ROA II at 131. In fact, OCCA held that Martinez did not show a strong possibility of counsel's performance being deficient, which is a less demanding standard. *Id*.; *see Simpson v. State*, 230 P.3d 888, 905-06 (Okla. Crim. App. 2010). No reasonable jurist would agree with OCCA's performance decision.

### 1. When Considering Counsel's Performance, OCCA Ignored *Strickland*'s Principal Concern.

Realistically, with Martinez's case, counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539

U.S. at 526. Regardless, OCCA should have considered counsel's underlying investigation and compared it to what competent counsel would do in their shoes. *See id*. at 523. OCCA declined to engage at all in evaluating trial counsel's investigation, as this Court has denounced before. *See Battenfield v. Gibson*, 236 F.3d 1215, 1228 n.7 (10th Cir. 2001).

Decades before Martinez's trial, *Strickland* emphasized counsel's duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 690-691. "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527. And calling a decision strategic does not make it so. Decisions "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691. *Strickland* makes clear the performance review is focused on the reasonableness of the investigation or the decision to end investigation, not on the presentation at trial. *Id*. at 522-23.

OCCA had this exactly backwards. *See* ROA II at 127-29. It reasoned that trial counsel performed adequately because they presented experts and evidence of Martinez's substance abuse, depression, sexual abuse, and good behavior in jail. *Id*.

21

at 9. Counsel "had access to an investigator and a mitigation expert, and understood the importance of developing and presenting mitigation factors." *Id*. at 10. The court pointed to counsel's opening and closing statements (without acknowledging they are not evidence) and underscored that Martinez's family and friends testified. *Id*. at 9-10. OCCA did not clarify that most of them testified for the State. Nor did the court explain that some of their testimony directly contradicted Martinez's experts and primary defense theory. *See* Tr. X at 49, 58, 69.

Like the state court in *Wiggins*, OCCA assumed that knowledge of Martinez's background, like that presented at trial, transformed investigative failures into tactical decisions. *See* 539 U.S. at 527. The "Supreme Court has squarely rejected the notion that, when counsel has 'some information with respect to petitioner's background,' counsel has necessarily fulfilled his constitutional duty to investigate and present a case in mitigation." *Anderson*, 476 F.3d at 1145 (quoting *Wiggins*, 539 U.S. at 527). At no point did OCCA use the often-emphasized standard that counsel's conduct is principally evaluated by the reasonableness of the investigation or any decision to forgo investigation. *See*, *e.g.*, *Wiggins*, 539 U.S. at 523; *Rompilla*, 545 U.S. at 383-84; *Young v. Sirmons*, 486 F.3d 655, 680 (10th Cir. 2007); *Littlejohn*, 704 F.3d at 862. "In any ineffectiveness case," *Strickland* demands counsel's failure to investigate "be directly assessed for reasonableness in all the circumstances." 539 U.S. at 690-91.

22

The flaw in OCCA's approach is revealed early in its discussion of Martinez's claim. OCCA correctly introduced the claim as counsel failing to "investigate, develop, and discover mitigating evidence." ROA II at 127. In the next sentence, the court summarized the trial presentation. *Id*. OCCA then said, "Petitioner argues this evidence was unconstitutionally insufficient." *Id*. It doubled down by reasoning that the "overall penalty phase defense was reasonably balanced and consistent with prevailing professional norms." *Id*. at 11. Contrary to OCCA's reasoning, presenting more evidence from a completed investigation does not remedy the error of incomplete investigation elsewhere. By analogy, no matter the evidence presented at a capital sentencing, counsel for a 17-year-old would still be ineffective for not checking her birthday. *Cf. Roper v. Simmons*, 543 U.S. 551, 578 (2005).

Only once did OCCA mention anything related to the underlying investigation. The court highlighted one sentence from an affidavit where the investigator said his "understanding" was that counsel strategically decided against presenting Martinez's grandfather as a witness. ROA II at 128-29; APCR, Att. 4 at ¶6. OCCA accepted the statement as fact, and it did not evaluate the reasonableness of the strategy or investigation behind it. *Id*. By doing so, OCCA disregarded *Strickland*'s basic premise that decisions "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691.

23

Martinez also raised counsel's failure to investigate and present his mother and uncle, but OCCA never mentioned them.

The Supreme Court has clearly instructed courts to consider "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *See id*. OCCA made no attempt to consider either. In fact, OCCA denied Martinez the opportunity to develop such evidence by rejecting his request for an evidentiary hearing, which is where *Strickland* evidence is developed since trial counsel are often unaware of their errors or unlikely to explain them on the record. *See*, *e.g.*, *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (discussing IAC evidence developed in state postconviction hearing); *Porter*, 558 U.S. at 33-36 (same); *Sears v. Upton*, 561 U.S. 945, 948-951 (2010) (same); *Rompilla*, 545 U.S. at 382-85 (same); *Wiggins*, 539 U.S. at 516-18; (*Terry*) *Williams*, 529 U.S. at 370-72 (same); *Strickland*, 466 U.S. at 675-76, 698-700 (same).

### 2. Counsel Did Not Conduct a Full Investigation, and They Presented a Poorly Investigated Defense.

A full investigation includes pursuing evidence sure to be presented at trial, especially when it is readily available. *Rompilla*, 545 U.S. at 383-84. Counsel planned to present an intoxication defense, yet they did not complete the underlying investigation into the defense. Any reasonable attorney planning an intoxication defense would thoroughly investigate close family members. Common sense

24

dictates that an intoxication defense is incomplete without a full investigation into the family.

Forty years ago, the public understanding on alcoholism led Congress to pass a law finding that "alcohol is one of the most dangerous drugs and the drug most frequently abused in the United States." 42 U.S.C. § 4541(a)(1). It emphasized that "alcohol abuse and alcoholism have a substantial impact on the families of alcohol abusers and alcoholics." 42 U.S.C. § 4541(a)(6). Congress also found that a family history of alcohol abuse puts a person at a higher risk of developing drinking problems. *Id*. at § 4541(a)(7). The common knowledge connection between addiction and family has been known for decades.

Even if Martinez's family disagreed about the facts, as Martinez's grandfather ultimately did, the investigation remained critical because it would have alerted counsel to the possibility of conflicting testimony. Counsel could have prepared for it. They had nothing to lose, and further investigation into Martinez's family could only strengthen their defense. There "is no substitute for the information counsel can glean from the family when researching the defendant's background, as they are almost always the only people who can provide a complete narrative of the defendant's life." *Wilson*, 536 F.3d at 1088. The worst-case scenario either leads to more mitigation or awareness of complexities or more aggravation.

Trial counsel's intoxication defense backfired in one of the worst possible ways. Counsel's first expert, Dr. Price, testified that Martinez "started at a young age and drank a lot and drank to intoxication most every day for over 15 years, which is pretty hard to do if you're his age." Tr. VIII at 28. Without meeting Martinez, the second expert agreed. The second expert, Dr. Lipman, told the jury that Martinez had been "drinking very heavily and continuously" from the ages of "15 through 29." *Id*. at 69. He had "no doubt" Martinez had been a chronic drinker for half of his life. *Id*. at 74. Both experts acknowledged they relied heavily on self-reported information. *Id*. at 27-28, 68-69.

Martinez's third expert, Dr. Villanueva, testified that Martinez had a drinking problem but "was not drinking every day" in high school. Tr. XI at 34. Martinez's grandfather, Marty, disagreed as well. He told the jury, "I don't drink. I don't want nobody drinking in my house and I never have and I never will." Tr. VI at 204. Marty said alcohol was not allowed in his house, "not even a beer," and it had been his rule "forever." *Id*. He emphasized, "That's my rule. That's my rule." *Id*. Marty acknowledged Martinez could have hidden his drinking, but trial counsel did not highlight this statement or make any attempt to recover from the damaging testimony. *Id*. at 205, 209. Counsel waived cross examination. *Id*. at 209.

Later, the mother of Martinez's oldest child told the jury Martinez didn't drink "very often" and she "only saw him with a beer on a rare occasion." Tr. X at 49. She

had known Martinez for at least a decade but had "never known him to be a drinker of any kind." *Id*. at 50. She "didn't see him with it other than a couple of times, maybe a handful." *Id*. at 49. Again, counsel made no attempt to contextualize or recover from the contradictory testimony. *See id*. at 55-56.

The mother of Martinez's other children testified that Martinez drank to intoxication on weekends, but "throughout the week he would drink but just like a beer or two." *Id*. at 69. On cross, counsel elicited that she and Martinez "r[a]n wild" on the weekend and the most she ever saw Martinez drink was the night he finished a bottle of liquor. *Id*. at 75-76. Within fifteen minutes, he had taken a nap and vomited all over the floor. *Id*. at 76. The State attempted to present a nurse from the detention center who treated Martinez after the offense, but the court sustained defense counsel's objection. Tr. VIII at 110-12. Martinez told the nurse he drinks only on Sundays and does not have a problem with alcohol. *Id*. at 112.

The implosion of the intoxication defense revealed counsel's investigation was unreasonable. As the State proved, supporting (or discrediting) an intoxication defense requires collateral witnesses. Without risk, further investigation into Martinez's family would have supported the intoxication defense at trial, informed the experts or prepared counsel for contradictory testimony. Worse yet, the witnesses were readily available. Martinez's mother and grandfather attended the trial, and Marty testified twice for the state. Uncle Richard had written prior counsel offering

his help. Counsel could have easily engaged Martinez's family. Nevertheless, counsel cut corners and presented a poorly investigated defense.

During closing, counsel tried to save face by telling the jury, "We've presented intoxication because frankly we don't understand what happened that night." Tr. IX at 34. "Maybe his intoxication explains it; maybe it doesn't." *Id*. Despite the open skepticism, the intoxication defense was incorporated into the sentencing hearing, which started a couple days later. Tr. XI at 96-97. At sentencing, counsel highlighted Martinez's drinking in opening and closing statements. Tr. XI at 6; Tr. XII at 8. Among the mitigating circumstances charged to the jury was the "chronic alcoholism of Mica Martinez." OR V at 858.

Like this Court has said, "We 'should not be ignorant as judges of what we know as' human beings." *Hooks*, 689 F.3d at 1185 (quoting *Watts v. Indiana*, 338 U.S. 49, 52 (1949)). A reasonable human being, even without legal training, would understand that families are painfully aware of a loved one's addiction. Considering counsel's legal training, they should have understood this as well.

### 3. Counsel Did Not Pursue Reasonable Investigative Leads.

Trial counsel failed to "follow up on leads that [were] readily identifiable in the evidence." *Littlejohn*, 704 F.3d at 862. Obvious red flags regarding Martinez's life or his drinking were in investigator memos, motions previously filed by the State

and defense, and trial counsel's planned intoxication testimony. Counsel either overlooked the red flags or ignored them.

Two years before trial, investigator John Milus talked with some of Martinez's loved ones, including his grandfather and mother. APCR, Att. 4. Although counsel changed numerous times, Milus remained on the case through trial. *Id*. His postconviction affidavit attached five memos dated between November 2010 and May 2011, all predating Martinez's trial by at least two years. *Id*.; Tr. V at 1. Milus addressed the memos to lawyers whose tenure on the case predated the attorneys who represented Martinez directly preceding conflict counsel who actually tried the case. APCR, Att. 4; OR V at 923, 926-931.

The memos revealed that Martinez's loved ones had different impressions of his drinking. APCR, Att. 4. For example, Martinez's aunt believed he started drinking at age eighteen. *Id*. at 11/4/2010 Memo. She thought Martinez's drinking became a serious problem three or four years before the offense, which was roughly ten years later than what the intoxication experts opined. *Id*.; Tr. VIII at 28, 69. Other family members did not mention Matinez's drinking at all. APCR, Att. 4 at 12/17/2010 Memo, 5/2/2011 Memo. The mother of Martinez's three youngest children, whom the State called to cast doubt on the intoxication defense, said Martinez "used alcohol daily often opening a beer upon waking up." *Id*. at 3/24/2011 Memo.

29

Regarding the life-history presentation, the investigator memos contained reasonable leads that would have triggered competent counsel to further investigate Martinez's family. For instance, Martinez's biological mother, Roberta, struggled before and after Martinez's birth and abandoned him for drugs and alcohol. APCR, Att. 4, 11/4/2010 Memo; *Id*., Att. 5 at ¶¶5-7. Martinez likely inherited addiction problems, and the trauma from a mentally unstable, drug dependent, and absent mother is among the strongest mitigating evidence. *Andrus*, 140 S. Ct. at 1883. She told the investigator about Martinez twice being hospitalized for depression. APCR, Att. 4 at 1/21/2011 Memo. Roberta also described Martinez's reaction to learning about his adoption, the secret the family kept from him, and how Martinez felt like he was robbed of two brothers in Roberta's other children. *Id*. Nevertheless, trial counsel did not recognize her in the courtroom until after opening statements had started. *Id*., Att. 5 at ¶4; *see* Tr. VI at 7-8, 12.

Martinez's grandfather Marty twice testified for the State. Tr. VI at 193; Tr. X at 30. Like Martinez's mother, Marty came to the sentencing hearing expecting to testify for the defense, but they never called him. APCR, Att. 3 at ¶3. Marty was an important witness since he was the constant in Martinez's life. After the death of Martinez's grandmother, it was Marty and Martinez learning a new life under the same roof. APCR, Att. 5 at ¶6. Marty never got over his wife's death, and he was unable to parent Martinez. *Id*.; Att. 4 at 12/17/2010 Memo. Martinez stepped up and

cared for his grandfather, and he started managing his grandfather's diabetes around the age of twelve. *Id.*; Att. 4 at 12/17/2010 Memo.

Uncle Richard had reached out to the prior legal team and was subpoenaed for trial, but the trial was delayed, and counsel later changed. *Id.*, Att. 5 at ¶¶1, 3, 4. Richard could testify to Martinez's mother abandoning him, Martinez's reaction to his grandmother falling ill and dying, the relationship between Martinez and his grandfather after her death, and Martinez's struggles with depression. *Id.* at ¶¶5, 6, 7. Richard saw Martinez as a baby brother. *Id.* at ¶1. But once conflict counsel entered the case, Richard never heard from the defense team despite his eagerness to help his baby brother and his knowledge of Martinez's lifelong struggles. *Id.* at ¶¶1, 3-5.

Moreover, counsel should have recognized red flags from their planned testimony. Like the State, counsel knew their experts would testify to Martinez's daily drinking, chronic alcoholism, and life history. OR IV at 748-49. Counsel knew the State was aware of their defense and Martinez's family and friends were on its witness list. *Id.*; Tr. VIII at 110-11; OR II at 264-272. Each witness who contradicted the intoxication defense at trial was on the State's witness list, which also included descriptions including events surrounding Martinez's drinking. OR II at 269-271. Counsel, again like the State, knew the intoxication experts relied heavily on self-reported information and did not conduct collateral interviews. Tr. VIII at 110-11;

OR IV at 748-49. Trial counsel should have connected the dots and further investigated their intoxication defense, like the State obviously did.

Additionally, two years before trial, prior counsel filed a witness list that counsel should have recognized as a major lead. The list acknowledged counsel's right to call State witnesses, and it then listed "additional witnesses" for the defense. OR II at 300-05. There, prior counsel explained that Martinez's mother, Roberta, would testify to leaving Martinez with her parents, hiding the truth behind Martinez's birth from him, and the resulting impact that the family secret had on Martinez. OR II at 303. Martinez's grandfather was a witness for the State, and its witness list noted he would testify to Martinez's drinking and would testify at the guilt and punishment phases. OR II at 373. Prior counsel also listed Uncle Richard as testifying to the family secret surrounding Martinez's birth, Martinez's upbringing and life-long struggles, and how Martinez thrived as a father. OR II at 302.

### 4. Counsel's Performance Contravened Prevailing Professional Norms.

The Supreme Court has long recognized the ABA standards as guides for determining what is reasonable under *Strickland*'s performance prong. *Padilla*, 559 U.S. at 366. For instance, the *Strickland* Court used the 1980 guidelines. 466 U.S. at 688. Back then, the guidelines acknowledged the "important role to perform in raising mitigating factors," such as the "defendant's background, education, employment record, mental and emotional stability, family relationships, and the

like." *ABA Standards for Criminal Justice* 4-4.1, 4-54 (2d ed. 1980). The guidelines

continued, counsel must conduct a "prompt investigation" and "explore all avenues

leading to facts relevant to the merits of the case and the penalty in the event of

conviction." *Id*. at 4-53.

Then in 1989, for the first time, the ABA published guidelines specific to

capital cases. Russell Stetler & Aurélie Tabuteau, *The ABA Guidelines: A Historical

Perspective*, 43 Hofstra L. Rev. 731, 731 (2015). The 1989 guidelines urged counsel

to investigate "all reasonably available mitigating evidence." *ABA Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1(C) (1989).

More than once, the Supreme Court and this Court have stressed this particular point.

*See*, *e.g.*, *Wiggins*, 539 U.S. at 524; *Rompilla*, 545 U.S. at 387 n.7; *Anderson*, 476

F.3d at 1142; *United States v. Barrett*, 797 F.3d 1207, 1227 (10th Cir. 2015). They

went on to say counsel should prepare witnesses and evidence "relating to the client's

life and development, from birth to the time of sentencing." *Id*. at 11.8.3(F)1.

Mitigating evidence should be effectively presented and "consistent with the defense

sentencing theory." *Id*. at 11.8.2(D).

The guidelines for capital cases were updated in 2003. *See ABA Guidelines

for the Appointment and Performance of Defense Counsel in Death Penalty Cases*

(rev. ed. 2003), in 31 Hofstra L. Rev. 913 (2003). Again, the guidelines urged counsel

to extensively investigate the client's family and social history, also called a life

history. *Id*. at 1022. The life-history investigation includes the client's parents, grandparents, aunts, and uncles. *Id*. at 1024. Competent counsel seek records for parents and grandparents, such as school, social service, military, and medical records. *Id*. at 1024-25. Importantly, counsel "should seek to minimize any inconsistencies." *Id*. at 1047.

Five years later, in 2008, supplementary guidelines stressed that counsel should locate and interview "lay witnesses or witnesses who are familiar with the defendant or his family." *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, in 36 Hofstra L. Rev. 677, 10.11(E)2 (2008). Competent representation and reasonable investigations require "ongoing reviews of the evidence, assessments of potential witnesses, and analyses of the most effective manner in which to convey the mitigating information." *Id*. at 10.4(B).

Similar professional practices have been described in judicial opinions. Before Martinez's trial, the Supreme Court explained that death penalty investigations required counsel to pursue "*all reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (quoting *ABA Guidelines 1989*, at 11.4.1(C) (emphasis added in *Wiggins*). Likewise, competent counsel should pursue the client's "medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 538 U.S. at 524 (emphasis in original).

34

More specifically, the Supreme Court has described evidence of a mentally unstable, drug dependent, absent mother as significantly mitigating. *Andrus*, 140 S. Ct. at 1883. Similarly, this Court reversed a death sentence (on an unpreserved issue) after a capital defendant's mother, without the noted struggles that Roberta faced, was excluded from testifying at his trial. *Dutton v. Brown*, 812 F.2d 593, 599 (10th Cir. 1987). The Court stressed the mother was in the courtroom and planned to testify about the client's "family background, medical history and education." *Id*. at 601.

Although state courts do not create clearly established federal law, their opinions offer insights into prevailing professional norms. For instance, OCCA has twice highlighted the "importance of a mother's testimony as mitigating evidence in a capital trial." *Coddington v. State*, 142 P.3d 437, 458 (Okla. Crim. App. 2006). In one case, despite the issue being unpreserved, the court vacated a death sentence after the mother's videotaped testimony was excluded from evidence. *Id*. 458-460. The jurors had the written testimony, but it was not enough. *Id*. at 459. "The humanizing effect of live testimony in the form of a mother testifying for her son as mitigation evidence in a capital murder trial cannot seriously be disregarded as irrelevant." *Id*. On another unpreserved issue in a different case, OCCA again acknowledged the powerful role a mother plays in capital trials. *Warner v. State*, 29 P.3d 569, 575 (Okla. Crim. App. 2001). The court held that counsel's performance

was deficient and prejudicial because he failed to request a continuance so the client's mother could testify. *Id*.

On a final note about norms, it is important to stress that trial counsel's conduct is compared to the professional norms that prevailed at the time of Martinez's trial. *See Strickland*, 466 U.S. at 687-88. Norms are "fluid and evolving." *Simon v. Epps*, 344 F. App'x 69, 72 (5th Cir. 2009). As the profession progresses, courts must resist the "distorting effects of hindsight." *Id*. Counsel's performance is evaluated "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Thus, if courts were to rely on norms of the early 2000s to judge conduct from the 1980s, the resulting decision may be too harsh. *Bobby v. Van Hook*, 558 U.S. 4, 7-8 (2009). In the same way, using norms of the 1980s to judge conduct from the early 2000s may lead to a decision that is too lenient. *Id*.

The petitioners in *Williams*, *Wiggins*, *Rompilla*, and *Porter* were all tried in the 1980s, at least twenty-three years before Martinez's trial. *See Williams*, 529 U.S. at 368; *Wiggins*, 539 U.S. at 515; *Rompilla*, 545 U.S. at 387 n. 7; *Porter*, 558 U.S. at 32. In *Sears*, the petitioner was tried twenty years before Martinez. *See Sears*, 561 U.S. at 947. Since the 1980s, prevailing norms have evolved. Just as courts cannot judge 1980s conduct with early 2000s norms, trial counsel's conduct at Martinez's

2013 trial should not be judged with norms that prevailed in the 1980s. *See Van Hook*, 558 U.S. at 7-8.

### 5.  Counsel's Investigation into Martinez's Upbringing and Mental Health Lacked Due Diligence.

Counsel must diligently pursue evidence of the client's upbringing and mental health until further investigation is no longer reasonably necessary. *Strickland*, 466 U.S. at 690-691. Such evidence is crucial because of the "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382 (1990) (internal quotation marks and emphasis omitted). Notwithstanding this "crucial" role, counsel's investigation was unreasonably limited, and so the defense team lacked common facts and collateral witnesses. Put differently, counsel relied too heavily on experts, and the experts were forced to rely on different information of unknown veracity. Counsel's unreasonable investigation led to the expert testimony being contradictory and lacking the support and legitimacy provided by collateral witnesses.

Counsel bear the "overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work." *ABA Guidelines 2003*, at 10.4(B). Bearing responsibility for the team requires that counsel play a managerial role that includes "continued exercise of supervisory authority over expert witnesses

37

and advisors to ensure that they examine necessary sources of information." *Postelle v. Carpenter*, 901 F.3d 1202, 1216 (10th Cir. 2018) (internal quotation marks and brackets omitted). Counsel cannot use the managerial role to delegate major legal tasks or "abdicate all responsibility for handling scientific or technical evidence." *Id*. At the end of the day, counsel decides "which witnesses and evidence to prepare" and how to "minimize any inconsistencies." *ABA Guidelines 2003*, at 10.11(F) and 10.10.1, *respectively*.

The use of collateral witnesses to support expert testimony is professional practice. *ABA Guidelines 2003*, at 1056, 10.11(F)(2). It combats jurors' well-known skepticism of defense experts. Fifteen years before Martinez's trial, one study found that capital jurors saw defense experts as negative influences on the jury more than twice as often as positive influences. Scott E. Sundby, *The Jury As Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109, 1112-13, 1123-25 (1997). On the other hand, jurors saw the defendant's family and friends as positive influences on the jury more than twice as often as negative influences. *Id*. at 1123-25.

The capital jurors also viewed defense experts as hired guns. *Id*. at 1125-26. Another study on civil trials revealed that jurors often viewed experts, on either side, as "chosen to testify because their opinions favor the party that calls them." N. Vidmar & R. Schuller, *Juries and Expert Evidence: Social Framework Testimony*,

52 Law & Contemp. Probs. 133, 171 (1989). Because of juror skepticism, if experts perform as a "soloist, presenting theories unsupported by facts established by more credible witnesses who are free of the suspicions attached to experts, the testimony is likely to be discounted at best or have a negative spillover effect at worse." Sundby, *Jury As Critic*, at 1144. But if an accompanist, and the expert "helps harmoniously explain, integrate, and provide context to evidence presented by others, the jury is far more likely to find the expert's testimony useful and reliable." *Id*.

Defense experts leaving positive impressions on the capital jurors correlated with life sentences. *Id*. at 1124. Although far from a randomized, placebo-controlled clinical trial, the study of the capital jurors supports what has long been considered professional practice. Collateral witnesses help protect defense experts from being cast as a hired gun. Defense experts are "most persuasive when adding context to facts and details of the client's life history presented by others; relying exclusively on such experts to make the case for life is a recipe for death." John Blume & Russell Stetler, *Mitigation Matters*, in *Tell the Client's Story: Mitigation in Criminal and Death Penalty Cases*, 38, ed. by Edward C. Monahan, James J. Clark, ABA Book Publishing (2017).

Martinez's counsel failed to adequately investigate Martinez's upbringing, so the experts were uninformed and without collateral support. The State picked up on

39

this. At trial, it emphasized the intoxication experts relied heavily on self-reported information and records stating Martinez "had the tendency to embellish his statements." Tr. VIII. at 52, 68-69, 93. The first expert continually emphasized his opinion was based on Martinez's records and self-reporting, implying that a full investigation with collateral witnesses may change his opinion. *Id*. at 27-28, 28, 30, 31, 32-33, 51-52. The State asked, "Did you talk to anyone else in regards to Mr. Martinez, specifically family members?" *Id*. at 51. "No, sir," the expert answered. *Id*. He interviewed only Martinez. *Id*. The second expert interviewed no one, not even Martinez. *Id*. at 51, 67-68.

Trial counsel also presented a life-history expert. On the stand, Villanueva walked through five slides, each focusing chronologically on four to six years of Martinez's life. Tr. XI at 14-68. She testified to obstacles Martinez faced, including bullying, health problems, incontinence, minimal parental guidance as a teenager, suicide attempts, depression, alcohol and drug use, molestation as a child, and the passing of his mother though Martinez would soon learn she was actually his grandmother. Tr. XI at 24-43. Villanueva described Martinez as a successful father and explained how Martinez participated in pow wows where he danced and sang with his tribe. *Id*.

Villanueva provided insight into Martinez's life, but she performed predominantly as a soloist. *See* Sundby, *Jury As Critic*, at 1144. She did not have

support from "more credible" collateral witnesses, who would be "free of the suspicions attached to experts." *Id*. True, Martinez's sister and two of his children testified. Tr. XI at 84-114. But they said nothing of the expert testimony on Martinez's lack of friends, being bullied as a child, health problems, suicide attempts, being a victim of sexual molestation, and his reaction to learning that his mother was really his grandmother. *Id*. Martinez's children described Martinez as a great father, but they were too young to say anything about his upbringing or mental health. *Id*. at 84-95. Aunt Kathy testified to the death of Martinez's grandmother and the minimal parental support Martinez received afterward. *Id*. at 103-04. But most of Villanueva's testimony was left unsupported, and it came after the intoxication testimony where trial counsel suffered the blow to their credibility.

The State emphasized the life-history expert, like the intoxication experts, relied too heavily on Martinez's self-reports instead of corroborating witnesses. Tr. VIII at 27-28, 68-69; Tr. XI at 45-46, 60; Tr. XII at 18-19, 22-23. It asked why Villanueva interviewed twelve people for her investigation but her testimony mentioned only two. Tr. XI at 45-46. "Yes, sir," the expert responded without further explanation. *Id*. at 46. When asked about Martinez's drinking, she told the jury her information came from Martinez and two of his friends. *Id*. at 60. The two friends were not in the courtroom to corroborate her story, and she then described Martinez's drinking differently than the State witnesses and other experts had earlier. *Id*. at 34,

38, 45-46, 60. The State asked whether Villanueva knew about Mary Carothers testifying that Martinez never drank more than a few beers. *Id*. at 60. Confusingly, Villanueva said she had "no knowledge" of the testimony, but trial counsel told her about it the day before, and the information would not alter her report. *Id*.

Villanueva also testified she "did not get any information" about Martinez's violent relationship with Carothers. *Id*. at 60-61. She then clarified and told the jury she heard stories about the relationship but was unable to verify the stories. *Id*. at 61. Martinez admitted it to her, and the investigator told her about it. *Id*. Yet she still excluded it from her report because she could not verify the information and because trial counsel did not tell her about it. *Id*. at 62, 65-66. This all came out on the stand, and the jurors learned more defense discrepancies. The jurors also learned that critical information, negative and aggravating information, was missing from the life-history expert's report.

Importantly, the life-history expert's independent investigation did not cure counsel's failure to fully investigate Martinez's family. Often, experts "will be more equipped to determine what avenues of investigation are likely to result in fruitful information." *Wilson*, 536 F.3d at 1089. But separate and independent investigations lack common facts, and counsel risk presenting inconsistent testimony and ruining their credibility. Information from an investigation must be shared, checked for accuracy and bias, and withstand the scrutiny of the defense team. To get there,

42

counsel must play a managerial role to ensure team members and witnesses are informed and operating on the same information. *Postelle*, 901 F.3d at 1216. Trial counsel failed to conduct a reasonable investigation, failed to play the managerial role on the team, and failed to present consistent expert testimony supported by collateral witnesses.

Hiring experts is easy. Difficulty comes with preparing the experts for trial and ensuring they have shared and relevant facts, which include a social history, particularly focused on the family and the client's mental health and upbringing. *See ABA Guidelines 2003*, at 1056, 10.11(F). Martinez's counsel did little to support their experts, which led to ineffective testimony. Or as counsel described their own expert to the jury, he "got on his high horse and he got in a little tit for tat that he shouldn't have done." Tr. IX at 37. Contrary to counsel's approach, competent counsel do not let a defense theory live and die by the jurors' willingness to trust the defense experts.

### D. OCCA's Factual Determinations Supporting Its Decision on Counsel's Performance Were Unreasonable.

OCCA found that counsel strategically decided against presenting Martinez's grandfather as a witness. This is a factual finding under AEDPA. *Meek*, 74 F.4th at 1266. Under § 2254(d)(2), the finding is evaluated "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). But OCCA based its strategy finding on a single conclusory statement. OCCA pointed to the sentence, acknowledged it does not provide further reasoning, and then found that counsel's

decision was strategic based on a presumption of competent representation and strategic decision-making. OCCA's use of circular reasoning here amounts to an unreasonable determination of fact, and it was based on an unreasonable factfinding process. *Smith v. Aldridge*, 904 F.3d 874, 882 (10th Cir. 2018). Alternatively, if OCCA's finding is not a factual finding in this context, then it is an unreasonable application of law. *See* 28 U.S.C. § 2254(d). In any event, the finding is also unreasonable in the traditional sense that it "plainly and materially" misstated the record. *Smith v. Duckworth*, 824 F.3d 1233, 1250 (10th Cir. 2016).

The one piece of evidence OCCA mentioned outside the trial was a line from the investigator's postconviction affidavit: "It is my understanding that trial attorneys did not call [Martinez's grandfather] as a second stage [witness] based on strategy." APCR, Att. 4 at ¶6. The investigator did not explain how he came to this understanding, the underlying investigation behind it, or anything about Martinez's mother and uncle. *See id*. Likewise, OCCA did not consider whether the investigator's "understanding" was reasonable, whether the investigation behind counsel's strategy was reasonable, or anything about Martinez's mother and uncle.

Just as it did when applying *Strickland*, OCCA's factfinding procedure was fundamentally inconsistent with established precedent requiring counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-691. Critically, "*Strickland*

does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527. Thus, under *Strickland*, a finding that counsel strategically decided to forgo investigation should consider the reasonableness of the investigation behind the decision. *Id*. "A 'tactical decision' is a precursor to concluding that counsel has developed a 'reasonable' mitigation theory in a particular case." *Sears*, 561 U.S. at 954.

OCCA denied Martinez an evidentiary hearing, and it presumed his counsel strategically decided against further investigation notwithstanding contrary evidence presented in his postconviction application. The court essentially found, based solely on the trial presentation, that counsel's "cursory investigation automatically justifies [their] tactical decision with respect to sentencing strategy." *Id*. The court explicitly said it "presume[d] that trial counsel limited further second-stage testimony for legitimate strategic reasons." ROA II at 129. Regarding the investigator affidavit, it then acknowledged "no specific reasons are offered regarding trial counsel's decisions not to call other mitigation witnesses, or ask more or different questions of the witnesses who testified." ROA II at 129.

OCCA's reasoning is circular. The court pointed to a conclusory statement in the investigator's affidavit that claimed counsel's decision was strategic; it then

ignored contrary evidence and "presume[d] that trial counsel limited further second-stage testimony for legitimate strategic reasons." ROA II at 129. The court's reasoning is exactly backwards: "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527. OCCA disregarded counsel's investigation to presume their decision was strategic. ROA II at 129.

*Strickland*'s presumption of effective counsel shoulders the defendant with the burden partially because she is the person most likely to have the relevant evidence to evaluate counsel's conduct. *Strickland*, 466 U.S. at 690-91. Likewise, Martinez is the best person to present evidence of his counsel's unreasonable performance, but OCCA denied him that opportunity. Altogether, OCCA used the presumption of effective counsel to bypass *Strickland*'s principal concern of whether counsel's investigation was reasonable, disregard evidence revealing the investigation to be unreasonable, and eliminate the possibility that more evidence of its unreasonableness would be developed. Ironically, instead of ensuring its production, OCCA used *Strickland*'s presumption to ensure relevant evidence could not be produced or considered. The factfinding procedure was objectively unreasonable.

Moreover, had OCCA engaged in proper factfinding, it would have found that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. Trial counsel failed to complete a full investigation into their intoxication defense. They failed to follow reasonable leads. Their investigation was far outside prevailing professional norms. And their investigation into Martinez's mental health and upbringing lacked due diligence. OCCA used the investigator's conclusory statement, however, to presume counsel strategically decided against adequately investigating Martinez's family. Its factfinding was objectively unreasonable, including its finding that "the overall penalty defense" (not the investigation) was consistent with prevailing professional norms. ROA II at 129.

**E. The District Court Erred by Finding That OCCA's Performance Holding Was Reasonable.**

The district court's analysis lost focus of the state court decision, and it supplanted the state court reasoning with its own reasoning. *Compare* ROA I at 648-653 *with* ROA II at 127-29. As a result, much of the court's analysis is irrelevant under AEDPA, which requires habeas courts to focus on the "state *court*'s ultimate decision." *Meek*, 74 F.4th at 1249 (emphasis in original). Nevertheless, the district court's ruling is addressed out of an abundance of caution. *See United States v. Leffler*, 942 F.3d 1192, 1199 (10th Cir. 2019) (explaining that the Court generally does not consider arguments unless raised in the opening brief).

47

Without distinguishing between §§ 2254(d)(1) and (2), the district court found that OCCA's decision was reasonable because Martinez's mother, grandfather, and uncle would not be helpful witnesses. ROA I at 648-651. The court emphasized that Martinez's grandfather was ill suited because he was unaware of Martinez's drinking and believed the living victim may have participated in the offense. ROA I at 649-650. Martinez's mother was ill suited because she was unreliable due to her "mental instability and drug use" and knew little about Martinez's upbringing since she abandoned him as a child. *Id*. And Martinez's uncle would have added little mitigating value because his affidavit was cumulative of the evidence presented at trial. *Id*. Ultimately, the failure to present the witnesses was strategic because counsel could have "legitimately viewed testimony from these witnesses as duplicative, unhelpful, or fraught with risk." ROA I at 651.

The district court erred, like OCCA, when it did not consider the entirety of Martinez's claim. Martinez raised counsel's failure to thoroughly investigate and present mitigating evidence, but the court focused solely on presentation. With this claim, the court should have focused on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Martinez's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis in original). Counsel had nothing to lose because they would either find good evidence or discrediting

48

evidence, which would have alerted counsel to its existence and if there was a need to prepare for it coming out at trial.

Moreover, when considering postconviction evidence, the district court should have judged counsel's performance based "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. The court cited evidence that counsel could not have known during their pretrial investigation, such as Uncle Richard's testimony being cumulative. There, the court is essentially determining prejudice, not performance. *Sears*, 561 U.S. at 954 n.10.

### F. Trial Counsel Were Ineffective for Failing to Adequately Investigate and Present Martinez's Mother, Grandfather, and Uncle as Mitigation Witnesses.

As detailed above, Martinez established that OCCA's performance ruling was objectively unreasonable and counsel's performance was deficient. Once AEDPA is satisfied, the Court considers the merits and evidence properly before the district court. *See Harris*, 941 F.3d at 972-73. The evidence presented to the district court confirms that trial counsel were deficient. For the prejudice prong, the Court's review is de novo, and it considers the evidence before the district court.

Appellate counsel failed to raise Martinez's *Strickland* claim, and they did not speak with Martinez before filing the opening brief. ROA II at 328, ¶6. Counsel delegated client communication to an investigator and did not think speaking with Martinez could improve the brief. *Id.* Like trial counsel, appellate counsel never

49

spoke with Martinez's mother and did not initially realize she attended the trial. *Id*. at 141-42, ¶5; 328, ¶5. Appellate counsel should have raised trial counsel's failure to investigate Martinez's mother, grandfather, and uncle as ineffective assistance of trial counsel. Trial counsel were ineffective, so appellate counsel were ineffective for not raising it. *Frederick*, 79 F.4th at 1105-06.

> ### 1. Counsel Performed Deficiently by Not Adequately Investigating and Presenting Martinez's Mother, Grandfather, and Uncle.

Overall, trial counsel's failures stemmed from inattention and poor preparation. The six months counsel had to prepare for trial was not enough. In interviews with Martinez's habeas team, counsel gave no reason or strategy for their failure to adequately investigate and present Martinez's mother, grandfather, and uncle. ROA II at 141-42. Martinez's loved ones and other members of the legal team confirmed it. *Id*. at 145-47, 164-65, 295-98, 304, 307.

Trial counsel knew the judge was eager to start the trial. *Id*. at 141, ¶2. The judge granted one continuance, and counsel did not ask for another. *Id*. Counsel knew the timeline would challenge their ability to render competent representation, but they nevertheless accepted the appointed and only requested one continuance. *Id*. They figured most people would be ineffective in that situation, so why not them. The jury sentenced Martinez to death six months after counsel were appointed. OR I at 926, 930-31; OR IV at 679-683.

Until it was brought to their attention, trial counsel did not know Martinez's mother was in the courtroom. ROA II at 141-42, ¶5. When interviewed during federal habeas proceedings, trial counsel did not remember meeting or speaking with her. *Id*. Roberta confirmed she never met or spoke with either lawyer. *Id*. at 146, ¶13. They could not remember the strategic reason, "if any," for failing to investigate her. *Id*. at 141-42, ¶5. Regardless, the investigation behind the decision was unreasonable, so any strategic decision would be too. Similarly, although Marty was a "wild card," counsel doubted any strategic reason for not presenting him. *Id*. at 142, ¶6. Again, any strategic decision about Marty's presentation would have been based on unreasonable investigation. Once trial counsel learned from habeas counsel that Marty suffered from PTSD, trial counsel were confident they would have pursued Marty's PTSD as a mitigation theory. *Id*.

Trial counsel did not remember when, but they briefly met Martinez's first lawyer, Lynn Burch, at a mall in Oklahoma City. *Id*., ¶8. Burch represented Martinez for two years. *Id*. at 301, ¶1. Despite counsel's timeframe and Burch's familiarity with the case, it "was not a particularly lengthy meeting." *Id*. at 142, ¶8. Burch does not remember the meeting and said no one asked for "any of the work [he] performed on the case." *Id*. at 301, ¶8.

The original legal team decided to present Martinez's "severe history of alcohol abuse" as a mitigation theme. *Id*. at 301, ¶7. The theory never changed. *Id*.

at 304, ¶5. Investigator Milus, the one person on the case from charging to sentence, said Martinez's legal team "never really looked into anything else." *Id*. Milus acknowledged the investigation should have sought evidence beyond the intoxication theme. *Id*. But no one told him to investigate anything else, so he did not investigate anything else. *Id*. Counsel were "stuck" on the intoxication defense. *Id*. at 295, ¶5. The original team thought the State would drop the death penalty, so they put off hiring a mitigation specialist until a year and a half after the crime. *Id*., ¶7.

Despite having four years to investigate their sole mitigation theory, the intoxication defense was poorly investigated. Dr. Lipman, the second of the two intoxication experts, described his role in Martinez's case as a "hypothetical process" that was "unconnected to the facts of [Martinez's] case." *Id*. at 307, ¶2. Counsel confirmed they asked for a "general opinion." *Id*. at 141, ¶3. Lipman is confident he explained his discomfort with the limited role and the little information counsel provided. *Id*. at 307, ¶2. His testimony suffered because of it. *Id*.

Ordinarily, Lipman would have interviewed Martinez and "anyone close to Martinez in the years preceding the crime." *Id*., ¶3. He would have interviewed witnesses knowledgeable about Martinez's behavior while intoxicated. *Id*. But Lipman interviewed no one, not even Martinez. *Id*. Lipman saw counsel as unwilling to provide more information and uninterested in anything beyond the hypotheticals.

*Id.*, ¶4. Counsel hired him at the last minute to bolster the other intoxication expert's report, though they did not remember why they failed to provide Lipman with adequate information. *Id.* at 141, ¶3.

Interviewing Martinez and collateral witnesses was critical for separating reality from false memories, a "vital distinction" as Lipman called it. *Id.* at 307, ¶3. Nevertheless, counsel did not facilitate collateral interviews. *Id.* Lipman did as trial counsel asked, and he gave an opinion based on a hypothetical. *Id.* at 307, ¶2. He also recommended Martinez see a neuropsychologist, but this frustrated counsel because they were short on time and had not considered neuropsychological testing. *Id.* at 141, ¶3.

The life-history expert was similarly disadvantaged. By the time Villanueva was hired, prior counsel had decided the defense would be intoxication. *Id.* at 295, ¶3. Counsel instructed Villanueva to focus on intoxication and forbade her from requesting records for other investigation. *Id.* at 295-97. Villanueva's investigation was becoming too emotional. *Id.* at 295, ¶3. Investigator Milus controlled who she interviewed, and he attended most interviews. *Id.* at 295-96, ¶4. Milus was rough, and his presence hindered Villanueva's investigation. *Id.* She typically conducted interviews one-on-one and without a time limit. *Id.* Martinez's aunt Kathy was the only person Villaneuva interviewed alone. *Id.* at 296. Besides Martinez's young children, Kathy was the only family member who testified on Martinez's behalf.

Villanueva wanted to do a full investigation into Martinez's family, particularly an in-depth analysis of his grandfather. *Id*. at 295-97. Marty fought in Vietnam and returned home with PTSD. *Id*. at 296, ¶7. Villanueva specialized in veterans with PTSD, and she wanted Marty's medical and military records. *Id*. Counsel claimed Marty would not sign a release, and her one meeting with Marty ended up being superficial. *Id*. At trial, counsel did not call or cross examine Marty. Had anyone asked, Marty would have signed a release so counsel could get his military and medical records. *Id*. at 164, ¶3.

Martinez's mother was an important witness, and Villanueva knew she had to gain her trust. *Id*. at 296-97, ¶8. Villanueva wanted the jurors to hear Roberta's story firsthand because she was "the root of the tree." *Id*. Like with Martinez's grandfather, however, Villanueva was allowed only one interview with Roberta. *Id*. At trial, counsel did not call Roberta as a witness. *Id*. at 147, ¶14. Roberta listened to her sister, Villanueva, and counsel tell the jury how she abandoned Martinez. *Id*. She was eager to testify and attended every day of the trial except one. *Id*. No one ever asked for Roberta's medical or mental health records although she would have gladly provided them to help Martinez. *Id*. As for Uncle Richard, counsel explicitly told Villanueva not to interview him. *Id*. at 296, ¶6.

Villanueva wanted to learn more about Martinez's grandmother and her side of the family. *Id*. Martinez's grandmother sparked his interest into "Comanche tribal

celebrations and pow-wows." *Id*. He felt safe with his tribe and found peace at powwows. *Id*. Martinez also spent a lot of time in the hospital as a child, and Villanueva suspected Martinez's history included more trauma. *Id*. at 295-96. Counsel said Milus would look into it. *Id*., ¶5. Had she been allowed, Villanueva would have "had more thorough interviews with the family." *Id*. at 296, ¶6. Martinez was nurtured in his grandmother's world, but Marty was unable to comfort him. *Id*. at 296, ¶7.

Villanueva felt isolated from the legal team. She suspected counsel kept her on the team only so the roster included a mitigation specialist. *Id*. at 297, ¶10. Unlike other cases, Villanueva was not involved with the trial presentation or choosing witnesses. *Id*. at 297, ¶11. She wanted to present more mitigation at trial, but trial counsel minimized her testimony. *Id*. at 297, ¶12. Counsel "did not prepare [Villanueva] for [her] testimony in any way." *Id*. at 297, ¶13. On the day she testified, she flew to Oklahoma, drove to the courthouse, testified, and then flew back to Texas. *Id*. Villanueva knew counsel made little use of her work at trial. *Id*. Villanueva never heard from appellate counsel. *Id*. at 298, ¶14.

## 2. Counsel's Deficient Performance Prejudiced Martinez.

To establish prejudice, Martinez must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In Oklahoma, where a death sentence

requires unanimity, prejudice is established when "there is a reasonable probability that at least one juror would have struck a different balance." *See Wiggins*, 539 U.S. at 537; *see also* 21 Okla. Stat. tit. § 701.11.

The Supreme Court has never "limited the prejudice inquiry under *Strickland* to cases in which there was only little or no mitigation evidence presented." *Sears*, 561 U.S. at 954 (quotation marks omitted). It has "found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." *Id*. (emphasis in original). For example, the Court found prejudice where counsel interviewed a dozen mitigation witnesses and put on seven witnesses at trial, including the defendant's mother. *Sears*, 561 U.S. at 958 (Scalia dissenting). In another case, the Supreme Court found prejudice where counsel developed a "very close" relationship with the defendant's family and hired three mental health professionals, with one of the professionals being the "best forensic psychiatrist around." *Rompilla*, 545 U.S. at 398 (Kennedy dissenting). There, the Court held that the petitioner had "shown beyond doubt that counsel's lapse was prejudicial." *Id*. at 390.

When evaluating the prejudice of counsel's unreasonable investigation, courts consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Sears*, 561 U.S. at 955-56 (cleaned up). Courts must

review "all the evidence—the good and the bad—when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009). Lastly, the Court considers "whether there is a reasonable probability that [the client] would have received a different sentence after a constitutionally sufficient mitigation investigation." *Sears*, 561 U.S. at 956. OCCA declined to consider it, so this Court tackles "the prejudice prong in the first instance." *Harris*, 941 F.3d at 982.

### a. The State Failed to Prove All the Aggravators.

In addition to the evidence of the offense, the State highlighted that Martinez's alcohol abuse was disputed. It presented and elicited testimony claiming Martinez was not that drunk on the night of the offense and that he did not have a history of chronic alcohol abuse. The State also solicited testimony that Martinez became violent when drinking. *Id*. at 38, 49, 70. During closing in the penalty phase, the State reminded the jury of Martinez's drunken violence and stressed that Martinez's own family minimized his drinking. Tr. XII at 21.

The State boiled Martinez's intoxication narrative down to Martinez being a chronic alcoholic, as Martinez's experts claimed, or a casual drinker, like his family explained. Similarly, it cast the life-history testimony as a story authored by the expert, disconnected from reality. Tr. XII at 18-19, 22-23. The jury rejected the continuing threat aggravator but found the other two aggravators. *Martinez*, 371 P.3d

at 1115. It also found that the aggravation outweighed the mitigation. *See* Tr. XIII at 33. The jury sentenced Martinez to death. *Id*.

### b. Counsel Presented a Superficially Reasonable Mitigation Theory.

Martinez's trial counsel were appointed, and six months later, the trial started. OR 680, 912. Their defense was voluntary intoxication, but they abandoned the instruction after the defense experts contradicted the testimony of each other and Martinez's loved ones. Tr. IX at 5. Still, the sentencing presentation was predominantly intoxication testimony copy-pasted from the guilt phase. *Compare* Tr. VI at 210-226, Tr. VIII at 4-110 (guilt-phase testimony incorporated by the defense) *with* Tr. XI at 14-118 (testimony presented by the defense in the penalty phase).

If counsel's "too drunk for the death penalty" defense failed, Martinez's best hope for a life sentence would be a mitigation presentation on the "kind of troubled history relevant to assessing a defendant's moral culpability," *Wiggins*, 539 U.S. at 535, along with "evidence that the defendant would not pose a danger if spared (but incarcerated)." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). To that end, defense counsel presented a life-history expert, Tr. XI at 14-68; Martinez's aunt and two of his children, *id*. at 84-114; and three guards responsible for Martinez's pretrial detainment, *id*. at 68-82, 114-18.

Lastly, defense counsel presented three guards who had monitored Martinez while he was detained pretrial. Tr. XI at 68-82, 114-18. The guards, who had laid eyes on Martinez and interacted with him daily, described him as a "model inmate" who "never had an infraction that involved any sort of violence or even threats of violence." *Id*. at 75, 79. When transporting him to and from the courthouse, Martinez rode in the van uncuffed. *Id*. at 116.

### c. When the Evidence is Reweighed, There Is a Reasonable Probability that One Juror Would Change Her Vote to Life.

Had trial counsel completed a reasonable investigation, they would have discovered the holes in their intoxication defense. Knowing that, counsel could have prepared for the complexities and presented a more compelling intoxication defense. At the same time, deeper investigation into Martinez's mother, grandfather, and uncle would have uncovered mitigating evidence and revealed the three witnesses to be excellent collateral support for Martinez's experts. Counsel would have maintained their credibility, which in turn would have enhanced the entirety of the defense presentation.

Martinez's upbringing must be understood within the context of his membership in the Comanche Nation, which sheds light on why investigating his family was critical. Martinez was close with his grandmother Dorothy, and he grew up attending powwows. Dorothy was born in Oklahoma around 1960. ROA II at 337, ¶4. During that time, the mass removal of native children from their families

59

and communities peaked in American. *Haaland v. Brackeen*, 599 U.S. 255, 303 (2023) (Gorsuch concurring). Surveys from 1969 and 1974 revealed that twenty-five to thirty-five percent of native children were removed from their families. *Id*.

Generously phrased, bureaucrats sought to assimilate native communities into American culture. *Id*. at 297-98. Truthfully, the federal government sought to destroy tribal identity. *Id*. at 298. The government focused on children because "the warm reciprocal affection existing between parents and children" was "among the strongest characteristics of the Indian nature." *Id*. at 299 (quoting *Annual Report of the Commissioner of Indian Affairs to the Secretary of Interior* 392 (1904)). The removals led to "long-lasting adverse health and emotional effects" that native communities continue to experience today. *Id*. at 305. "In all its many forms, the dissolution of the Indian family has had devastating effects on children and parents alike." *Id*. at 297.

Martinez's grandmother was born during the peak of the intentional destruction of native families and tribal identity. *Id*. at 303; ROA II at 337, ¶4. Dorothy's mother was a medicine woman, and Dorothy was instrumental in preserving the Comanche language. *Id*. at 337, ¶4. The family lived within a 20-mile radius of each other in Indiahoma, and gatherings often grew to fifty people. *Id*. When Dorothy met Marty, she already had Roberta. *Id*. at 338, ¶5. Growing up in a large family and during mass removal, Dorothy valued family. She taught Martinez

to do the same, and she told him the history of their family and tribe. *Id*. at 350, ¶2.

Comanche rely on an oral history, so it must be passed on if it is going to survive.

*See id*. When a member dies, part of the language and culture dies with her.

Roberta remembered her adoptive father Marty "fly[ing] of the handle" and

verbally abusing her. *Id*. at 339, ¶¶9-11. Dorothy and Marty separated for a couple

years, during which time Roberta watched Dorothy's boyfriend violently attack her

mother, breaking her ribs and blackening her eyes. *Id*. at 340, ¶13. The boyfriend

started to sexually assault Roberta. *Id*. at 340, ¶14. Dorothy blamed Roberta. *Id*

Roberta started abusing drugs and alcohol, and it led to her "pretty much having

[her] own room" at the psychiatric hospital. *Id*. at 340, ¶15. After an abortion at

sixteen, Roberta became pregnant at eighteen with Martinez. *Id*. at 341-42, ¶16.

Martinez was likely exposed in utero to alcohol and drugs. *Id*. at 341, ¶17.

In his first two months, Roberta abandoned her baby and gave Martinez to her

parents. *Id*. at 343, B. Dorothy and Marty told the family never to let Martinez know

Roberta is his biological mother. *Id*. When Martinez was in elementary school, the

principal beat Martinez with a paddle. *Id*. at 345, ¶1. The pain was unbearable, and

Martinez sometimes wore two pairs of pants. *Id*. at 345, ¶2. Native children got it

the worst. *Id*. at 345-46.

When Martinez was ten or eleven, he was attacked by a group of older boys

at a powwow. *Id*. at 347, ¶1. Powwows were supposed to be Martinez's safe place.

*Id*. Around the same time, two female cousins in junior high brought Martinez into one of their bedrooms. *Id*. at 367, ¶5. They kissed him and put his hands down their pants. *Id*. The older girls would put their tongue in Martinez's mouth and touch his penis. *Id*. He could not remember how often this happened. *Id*. Martinez began to harden and vowed to always protect himself. *Id*. He started fighting, harming himself, and learning to withstand pain. *Id*. at 349, ¶6. Martinez started having dissociative states, and he grew wary of people. *Id*. at 349, ¶6. Marty and Dorothy spoiled their grandson, but they were also uninvolved and often did not know what Martinez was going through. *Id*. at 351, ¶4.

Within a year of learning of her diagnosis, Dorothy died from cancer at forty-seven years old. *Id*. at 350, ¶1. Martinez watched Dorothy wither away, but he has no memory of this. *Id*. at 352, ¶7. Dorothy's passing destroyed Martinez. He mourns her death today as intensely as when it happened. *Id*. at 353, ¶8. Later, Martinez learned Dorothy was not his real mother. *Id*. at 362-63. Of course, with this information came the news his whole family had lied to him. Dorothy talked to Martinez like a son and taught him the importance of family and the tribe. *Id*. at 336-37. Sometimes Martinez pretended like the family secret was no big deal, other times he felt betrayed. *Id*. at 364. ¶5. With his grandmother gone, the black-sheep sister turned out to be his mother. *Id*. at 362-65. Martinez avoided Roberta, but they grew closer and started drinking and doing drugs together. *Id*. at 365, ¶8. Martinez's

friends and family said he changed after his grandmother's death. *Id*. at 377, ¶4. He became irritable and withdrawn. *Id*.

Martinez continued living with Marty. *Id*. at 383, ¶6. Marty was verbally abusive, and he berated his immediate children in front of Martinez. *Id*. He hit Martinez's Uncle Richard, a reminder that this violence used to lead to Dorothy and Marty fighting. *Id*. at 339, ¶11. If Martinez made a mistake, Marty yelled and screamed at him. *Id*. at 383, ¶6. Marty was distant. *Id*. at 385, ¶13. He served two tours in Vietnam, and he lived with PTSD ever since. *Id*. at 337, ¶3; 353-56.

Martinez remembers being depressed in preschool when his cousin died in a violent motorcycle accident. *Id*. at 376, ¶1. When Martinez was fourteen, he saw his younger half-brother try to hang himself. *Id*. His brother had wrapped fishing wire around his neck until he turned blue. *Id*. Soon after, Martinez tried to kill himself. *Id*. at 376, ¶2. At that time, Martinez drank heavily and used drugs. He had just walked in on his little brother strangling himself, and a friend of Martinez's had used one of Martinez's guns to kill himself. *Id*. Martinez sat on his bed and pulled the trigger, but the gun did not go off. *Id*. at 377, ¶3.

**G. At Minimum, This Court Should Remand for an Evidentiary Hearing.**

State courts are "'presumptively competent ... to adjudicate claims arising under, federal law," and so this Court's "watchwords" are "deference and reasonableness." *Meek*, 74 F.4th at 1248 (quoting *Tafflin v. Levitt*, 493 U.S. 455, 458

(1990)). Habeas courts presume state courts are providing "a reasoned method of inquiry into relevant questions of fact and law (including, of course, all federal issues applicable to the case)." Paul Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 456 (1963). The method of inquiry includes furnishing "the conditions and tools of inquiry … to assure a reasoned probability that the facts were correctly found and the law correctly applied." *Id*. at 455. Once a state declines to provide the necessary tools of inquiry, however, "the due process clause itself demands that its conclusions of fact or law should not be respected." *Id*. at 456. As state processes erode, so too do the comity interests underlying this Court's deference to state courts. *Id*. at 455.

Developing the factual basis, whether in state or federal court, is essential to the success of a *Strickland* claim. Counsel are often unaware of their errors, especially when the *Strickland* claim is based on a failure to investigate. If counsel are aware, they are unlikely to detail the errors at trial and on the record. The Supreme Court's major cases, and the Court's reliance on evidence developed at postconviction hearings reveals that successful *Strickland* claims are predicated on a meaningful opportunity to develop evidence. *See Andrus*, 140 S. Ct. at 1881; *Porter*, 558 U.S. at 33-36; *Sears*, 561 U.S. at 948-951; *Rompilla*, 545 U.S. at 382-85; *Wiggins*, 539 U.S. at 516-18; *Terry Williams*, 529 U.S. at 370-72; *Strickland*, 466 U.S. at 675-76, 698-700. A similar trend is found in this Court's successful

*Strickland* cases. *See, e.g., Battenfield*, 236 F.3d at 1220, 1227-27; *Fisher v. Gibson*, 282 F.3d 1283, 1289 (10th Cir. 2002); *Hooper v. Mullin*, 314 F.3d 1162, 1167 (10th Cir. 2002); *Cargle*, 317 F.3d at 1222; *Smith*, 379 F.3d at 925, 939; *Hooks*, 689 F.3d at 1161, 1205.

No court has ever provided Martinez "the conditions and tools of inquiry … to assure a reasoned probability that the facts were correctly found." Bator, *Habeas for State Prisoners*, 76 Harv. L. Rev. at 455. He twice sought an evidentiary hearing in state court. OCCA denied each request. ROA I at 344-45; Motion for Evidentiary Hearing, *Martinez*, PCD-2017-951; Motion for Evidentiary Hearing, *Martinez*, PCD-2013-936. Martinez presented affidavits containing specific and particularized facts revealing his counsel to be ineffective. *Id*. He diligently tried to develop the facts supporting his IAAC claim. *See Harris*, 941 F.3d at 983. Since § 2254(d) is either satisfied or does not apply, Martinez's diligence means AEDPA's restrictions on developing evidence in federal court are inapposite. *See id*.; *(Michael) Williams*, 529 U.S. at 437; *Littlejohn*, 704 F.3d at 857.

Martinez asked the district court for an evidentiary hearing on his IAAC claim in his initial habeas petition. ROA II at 72. A few months later, Martinez asked again, arguing the facts presented entitle him to habeas relief. ROA I at 344; *see Littlejohn*, 704 F.3d at 858. The court granted an evidentiary hearing on another claim. ROA I at 379-380. In its order, the court did not apply a legal standard to Martinez's request

for an evidentiary hearing on the IAAC claim, engage with the IAAC evidence, or explicitly deny a hearing on the IAAC claim. *Id*. Three months later, the court denied Martinez a hearing on his IAAC claim in its order denying habeas relief and a COA. The court did not acknowledge the new evidence or explain why it was not considered. Neither *Pinholster*, § 2254(d)(2), nor § 2254(e)(2) precluded the district court from considering new evidence of prejudice. The same is true for this Court regarding performance once AEDPA is satisfied. *See Harris*, 941 F.3d at 983.

Because AEDPA's evidentiary restrictions do not apply to Martinez's IAAC claim, the Court uses pre-AEDPA standards to consider his request for an evidentiary hearing. *Littlejohn*, 704 F.3d at 858. Martinez is entitled to an evidentiary hearing because his allegations, if true, entitle him to habeas relief. *Id*. The district court erred by not granting Martinez a hearing on his IAAC claim.

<u>PROPOSITION TWO</u>

**THE INTRODUCTION OF AN IRRELEVANT AND INFLAMMATORY RACIAL SLUR DEPRIVED MARTINEZ OF A RELIABLE SENTENCING HEARING.**

Martinez's Eighth and Fourteenth Amendment rights to a fair sentencing proceeding and due process were violated by the introduction of an irrelevant and prejudicial racial epithet that was neither connected with the crimes charged nor the aggravating factor sought to be proved. *Woodson v. North Carolina*, 428 U.S. 280, 288 (1976) (holding the Eighth Amendment stands to assure the State's power to

punish is "exercised within the limits of civilized standards"). The error had a substantial and injurious effect on the jury's death sentence.

During sentencing, the State introduced evidence of a fight Martinez had with two individuals eleven years before his trial. Arguably, the fact the fight occurred would be relevant evidence of a continuing threat. However, during the presentation of the witness's testimony, the violation became significantly more egregious.

Prosecutor Valdez seized on an opportunity during his opening statement to present details of the altercation. Standing alone, the State's mentioning the altercation with "two Black males" would not be sufficiently prejudicial. But the specifics of the fight highlighted by the prosecutor were irrelevant and highly prejudicial, thereby depriving Martinez of his right to a reliable capital-sentencing proceeding.

**A. The State Provoked Its Witness to Use a Racial Slur.**

At sentencing, the prosecutor introduced a fight between Martinez and two men that occurred eleven years before trial. Two years before Martinez's trial, Prosecutor Valdez filed a "Supplemental Discovery Response to the Testimony of Mary Carothers, A Second Stage Witness, In Regards to the Aggravator of Continuing Threat of the Bill of Particulars." OR Vol. III at 410. Specifically, the prosecutor laid out in the notice that Carothers and Martinez were going through a drive-thru lane of a Taco Bell in Lawton when Martinez jumped out of the vehicle.

*Id*.  Martinez fought with two Black men for no reason. *Id*. And, when Martinez returned to the vehicle, he told Carothers the Black men were going to rape her. *Id*.

During his second-stage opening statement, Prosecutor Valdez informed the jury a former girlfriend, Carothers, would testify about the altercation, including emphasizing the men were Black. Tr. X at 19. Defense counsel, who believed Carothers to be an unpredictable witness, spoke with the prosecutor before second stage and warned him against calling her.[1]

Defense counsel alerted the prosecutor to the fact that Carothers had a profound hatred for Martinez and that she could not be trusted to tell the truth or to not say something outrageous. Tr. X at 88-89. In his discussion with the prosecutor, defense counsel labeled Carothers as a "wild card" and warned Carothers would run through any door the prosecution opened. *Id*. at 88. The prosecutor ignored the sound warnings and called Ms. Carothers as a second-stage witness. *Id*. at 44.

Carothers testified she and Martinez dated for approximately two and a half years and shared a daughter, Cynthia. *Id*. at 48, 50. Prosecutor Valdez asked several

---

[1]According to trial counsel, "I approached Assistant District Attorney Eddie Valdez before Mary Carothers testified and urged him more than once not to call her. I told him that I believed that she would try to harpoon Mica as it was well known that she hated Mica and could not be trusted to be honest when it came to him. Eddie called her as a witness anyway. He then elicited testimony from her that was, in my opinion, both highly prejudicial and completely irrelevant. I assume this testimony biased each of the jurors against Mica and it seems logical that it particularly prejudiced him with the African American jurors." ROA II at 142.

questions about the relationship between Martinez and his daughter. *Id*. at 50-51. In response to questions about the relationship with Cynthia, Carothers talked about the Taco Bell incident. *Id*. at 50-51. Martinez "got into an altercation with a couple of guys walking by on the street. He jumped out of the truck at the ordering speaker and went across the parking lot and started fighting with two guys that were just walking down the street." *Id*. at 51.

Prosecutor Valdez did not end the line of examination after eliciting Martinez, "got into an altercation with a couple of guys walking by on the street." *Id*. Instead, he continued to ask questions that ultimately led to the following:

> Q:    Now, you testified there was [sic] two males. Could you describe these males?
> A:    They were African American, maybe teenagers.
> Q:    Two black males?
> A:    Yes, sir.

Tr. X at 51.

Then, the prosecutor continued his questioning by asking how old she and Martinez were at the time and for Carothers to repeat the events. *Id*. at 51-52. Carothers testified that Martinez said nothing as he exited the truck. *Id*. at 52. The prosecutor then asked Carothers if she asked Martinez why he fought them upon his return to the truck. Carothers responded in the affirmative and gave the following response: "He said 'Those two n*****s said they were going to rape you.'" *Id*. at 53.

Defense counsel moved for an immediate mistrial, arguing they had warned the prosecutor he should not call this witness for fear that Carothers's testimony would lead to such an incident. Prosecutor Valdez acknowledged he had spoken with the witness after speaking with defense counsel about their concerns. *Id*. at 53-54. After the prosecutor claimed he did not know Carothers would use the epithet, the court denied the mistrial motion but admonished the jury to disregard "[a]ny racial statements that were just made." *Id*. at 54.

**B. OCCA Did Not Adjudicate the Eighth Amendment Claim; Hence, This Court's Review is De Novo.**

OCCA's decision only addressed the state law "evidentiary harpoon" issue and the First Amendment issue raised in *Dawson v. Delaware*, 503 U.S. 159 (1992). After resolving the purely state-law issue, OCCA turned to Martinez's First Amendment claim. *Martinez*, 371 P.3d at 1114-15.  And, without addressing the Eighth Amendment claim, OCCA concluded, "We find no violation of Appellant's free speech rights under *Dawson*; and the evidentiary error, if any, was cured by the trial court's instruction." *Id*. OCCA failed to address the Eighth Amendment's requirement for heightened scrutiny in capital-sentencing proceedings as it applied to Martinez.

The district court held Martinez cannot overcome the strong presumption that OCCA adjudicated his Eighth Amendment claim on the merits. ROA I at 660. In doing so, the district court found OCCA, "specifically recognized the basis for the

70

Eighth Amendment claim when it summarized Petitioner's argument as including an assertion that he was denied a fair sentencing hearing." *Id*. The district court concluded that the claim was not "rejected as a result of sheer inadvertence," but, rather, OCCA "simply regard[ed] [the Eighth Amendment claim] as too insubstantial to merit discussion." ROA I at 660-61.

Although raised as an error on direct appeal, OCCA failed to address the violation of a reliable and heightened capital sentencing proceeding as required under the Eighth Amendment. *Martinez*, 371 P.3d at 1114-15; ROA I at 92-97. In *Rompilla*, the state courts did not reach the issue of *Strickland* prejudice, thereby triggering de novo review. 545 U.S. at 390 (reviewing *Strickland* prejudice de novo because the state-court decision did not reach the question). Likewise, Martinez's federal constitutional violation was not properly adjudicated by the state court. OCCA's review of only the state evidentiary and First Amendment issues was an incomplete review of the entire claim, thereby requiring de novo review of the Eighth Amendment violation of Martinez's right to a reliable capital sentencing proceeding.

In deciding Martinez's claim, OCCA held, "Appellant argues that testimony about his use of racial epithets during a fight violated his constitutional right to freedom of speech and denied him a fair sentencing proceeding." *Id.*, 371 P.3d at 1114. However, OCCA failed to adjudicate the fair sentencing claim in its analysis.

First, the court addressed Martinez's claim that "the racial comments were an evidentiary harpoon." *Id.* at 1115. The court ruled that the statements at issue were not an "evidentiary harpoon" and that the trial court's curative instruction cured any error that might have occurred "from this fleeting remark." *Id.*

In *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011) and *Johnson v. Williams,* 568 U.S. 289, 300-301 (2013), the Supreme Court established a rebuttable presumption that the defendant's claims were adjudicated on the merits by the state court. Here, Martinez can rebut the presumption that OCCA adjudicated the claim. Unlike the court in *Williams*, OCCA's decision did not address the merits of the Eighth Amendment claim and allowed no further proceedings to resolve that claim.

Quite the contrary, OCCA's opinion left no uncertainty as to the basis for its holding. OCCA denied relief based only on an analysis of state law addressing an evidentiary harpoon and the First Amendment under *Dawson*. Consequently, Martinez has met the rebuttable presumption that his Eighth Amendment claim was not adjudicated. *James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013) (holding *Williams* requires reviewing courts to give state courts the benefit of the doubt when the basis for their holdings is unclear; it does not require reviewing courts to ignore a state court's explicit explanation of its own holding.).

The record shows that Martinez fairly presented his Eighth Amendment sentencing claim to OCCA. OCCA simply failed to discuss that constitutional

portion of the claim. Martinez has rebutted the presumption that OCCA rejected the Eighth Amendment claim on the merits.  Nothing in the OCCA opinion even hints that the majority acknowledged, much less evaluated, the absence of the Eighth Amendment claim, which, in turn, requires de novo review. *Accord Graham v. White*, ___ F.Supp.3d ___, *16, No. 23-CV-0164-CVE-SH, 2023 WL4141662, (N.D. Okla. June 22, 2023) (holding that because the OCCA majority inadvertently overlooked, or intentionally ignored, Graham's Fourteenth Amendment due process claim, § 2254(d)'s framework does not apply; as a result, court reviewed the claim de novo).

### C.  Alternatively, OCCA's Decision Was Objectively Unreasonable.

OCCA determined there was not a violation of Martinez's free speech rights under *Dawson*, and if there was an evidentiary error, it was cured by the trial court's instruction to the jury. *Martinez*, 371 P.3d at 1115. This determination was contrary to clearly established federal law, and the court's decision was premised on an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d).

### 1.  OCCA's Decision Was Contrary to *Caldwell*.

OCCA's decision was contrary to clearly established law, namely *Caldwell v. Mississippi*, 472 U.S. 320 (1985). The Eighth and Fourteenth Amendments demand a higher degree of reliability and scrutiny in capital cases. This scrutiny extends to the sentencing proceedings. *Id.* at 329 (finding that many of the limits placed on

imposing capital punishment are rooted in the concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion).

In other words, a capital sentencing proceeding must be consistent with the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." *Id*. at 323 (citing *Woodson*, 428 U.S. at 305). OCCA's decision was contrary to the instruction of *Caldwell*. While OCCA conceded the witness's interjection would be found "morally reprehensible" by the jury,[2] it also found that the error was corrected by the trial court's instruction. *Martinez*, 371 P.3d at 1115.

Where admitted evidence is later ruled inadmissible, a cautionary instruction is ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error. *United States v. Morgan*, 748 F.3d 1024, 1039 (10th Cir. 2014). However, as an exception to the general rule, where the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, even when admonished to do so, a mistrial should be ordered. *Id.* at 1039-40.

---

[2] Citing to *Dawson*, 503 U.S. at 167.

Here, given the nature of Carothers's interjection, it was an exception to the general rule that a cautionary instruction cures the prejudicial effect. Neither the crimes charged, nor the aggravators alleged were racially motivated. Yet, this outburst transformed the aggravating evidence into something that was racially motivated. This was contrary to federal law and resulted in a denial of Martinez's Eighth and Fourteenth Amendment rights to have a fair and reliable sentencing proceeding.

### 2. OCCA's Decision Was Based on an Unreasonable Determination of Facts.

Moreover, OCCA's decision was based on unreasonable determinations of fact. 28 U.S.C. § 2254(d)(2). OCCA found that Carothers interjected the comment "unexpectedly." *Martinez*, 371 P.3d at 1115. The court's finding is belied by the record. Prosecutor Valdez placed an emphasis on the race of the men at the Taco Bell in his pleading giving notice of Carothers's testimony, in his opening statement, and ultimately during his examination of Carothers. In addition, defense counsel warned the prosecutor that Carothers held ill feelings towards Martinez and would likely testify to something unexpected. OR IV at 410; Tr. X at 19, 88.

Nevertheless, the State called Carothers as a second-stage witness. After the relevant facts were in the record, the prosecutor continued with his cross-examination of this witness until he elicited the inflammatory statement from her. *Id*. at 55. As a result, Carothers's testimony went from "he got into an altercation

with a couple of guys" to the two males were "African Americans" to those "n****s

wanted to rape you." *Id*. at 51-53.

OCCA failed to address the prosecutor's own emphasis on the race of the two

men at the Taco Bell or the progression of events between the prosecutor and the

witness ultimately leading to Carothers's outburst. Also absent from OCCA's

discussion of the issue was the presence of two African American jurors. Ultimately,

this was the jury that sentenced Martinez to death after hearing the irrelevant and

racially charged evidence.[3] These omissions in the facts, which buttressed OCCA's

decision, resulted in the denial of Martinez's right to a fair capital sentencing

proceeding.

The test prescribed by *Romano* for a constitutional violation attributable to

evidence improperly admitted at a capital-sentencing proceeding is whether the

evidence "so infected the sentencing proceeding with unfairness as to render the

jury's imposition of the death penalty a denial of due process." *Kansas v. Carr*, 577

U.S. 108, 123-24 (2016) citing *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). Here,

Martinez meets that test.

---

[3]OCCA's only mention of this significant fact was in a brief summary of the record:
"After this testimony, defense counsel moved for a mistrial, noting that two African
Americans were on the jury." *Martinez*, 371 P.3d at 1114.

### D. Martinez's Fair-Trial Claim Properly Relied on *Caldwell* and *Woodson.*

The Supreme Court has long held that the Eighth and Fourteenth Amendments demand a higher degree of reliability and scrutiny in capital cases. *See Caldwell*, 472 U.S. at 323; *Woodson*, 428 U.S. at 305. The district court found Martinez's brief citations to *Caldwell* and *Woodson* did not support an Eighth Amendment violation to a fair sentencing proceeding or a Fourteenth Amendment violation to due process based on the witness's inflammatory statement. ROA I at 661. This was an erroneous ruling.

On direct appeal, Martinez argued the circumstances of the racial epithet were similar to an evidentiary harpoon and violated his First Amendment right to free speech, as well as his Eighth Amendment right to a reliable capital sentencing procedure, citing to *Caldwell* and *Woodson*. ROA I at 96. While Martinez's arguments may be described as artless, they nonetheless presented and supported the claim. This Court has acknowledged "once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Honie v. Powell*, 58 F.4th 1173, 1187 (10th Cir. 2023); *see also Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (internal citation and quotation marks omitted). ("[T]he crucial inquiry is whether the substance of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim.").

The district court held the relevant inquiry is "simply whether the witness remark was 'so prejudicial in the context of the proceedings as a whole that [the petitioner] was deprived of the fundamental fairness essential to the concept of due process.'" ROA I at 663 (citation omitted). The court incorrectly found the racial epithet did not violate due process because it was neither solicited, nor expected, and the trial judge immediately instructed the jury to disregard it. ROA I at 663-64. Martinez was denied due process and a fair capital-sentencing proceeding as a result of Carothers's inflammatory interjection because the prosecutor made the race of the men at the Taco Bell an issue. And racial slurs such as "n****s" naturally elicit an emotional response, especially for people of color.

The district court failed to include a thorough examination of the trial record in its analysis. As the court surmised, the record indicates the prosecutor denied knowing Carothers would use a racial epithet and the trial court and defense counsel agreed the prosecutor did not anticipate the use of this specific epithet. ROA I at 663; Tr. X at 88. However, in its analysis, the district court declined to fully incorporate defense counsel's blatant warning to the prosecutor before Carothers's testimony.

> I do not suspect that the State knew the N-word was coming out of her mouth, we did have a discussion off the record, earlier this morning, about the fact that Ms. Carothers was a "wild card." She was dangerous because of her clear dislike of Martinez, I specifically told Valdez that if you open the door, she will run right through it, so for the record, while I do not suspect the State knew what was coming, I do believe that we were all on notice that she had the potential to do that. And we discussed this before she ever testified.

78

ROA I at 663; Tr. X at 88-89; *see also* n. 3, *supra*. Furthermore, the district court found there "is nothing suspect about the prosecutor's line of questioning with Ms. Carothers, where he appears to simply be trying to elicit details regarding the altercation." ROA I at 663-64.

Here, the race of the men at the Taco Bell was irrelevant to the crimes charged and aggravating circumstances alleged. Yet, the prosecutor elicited the race of the two men in the altercation during his opening statement to inflame the jurors as he alleged Martinez was a continuing threat. Prosecutor Valdez could have obtained details such as time and place of the alleged altercation without the detail of the race of the men involved. Yet he continued to ask Carothers about the two men involved until she responded with the racial epithet.

The Constitution prohibits racially biased prosecutorial arguments. *McClesky v. Kemp*, 481 U.S. 279, 309, n.30 (1987). Such an argument is an affront to the Constitution's guarantee of equal protection of the laws; and, by threatening to cultivate bias in the jury, it equally offends the defendant's right to an impartial jury. *Calhoun v. United States*, 478 F. App'x. 193 (5th Cir. 2012). "If government counsel in a criminal suit is allowed to inflame the jurors by irrelevantly arousing their deepest prejudices, the jury may become in his hands a lethal weapon directed against defendants who may be innocent. He should not be permitted to summon

that thirteenth juror, prejudice." *Id*. (quoting *United States v. Antonelli Fireworks Co*., 155 F.2d 631, 659 (2d Cir. 1946)) (Frank, J., dissenting) (footnote omitted).

["R]acial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017). The Supreme Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. *Id*. And an effort to address the most serious statements of racial bias attempts to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy. *Id*.

The district court found that jurors are presumed to follow the court's instructions. The district court relied on the rejection of the continuing threat aggravator to infer the jury heeded the trial court's instruction, while suggesting Martinez had failed to offer any evidence to overcome the presumption. ROA I at 664. It is equally viable that the rejection of the "continuing threat" aggravator was not unanimous. There were two African American jurors on Martinez's jury. The district court's finding ignores the possibility that the interjection of the racial epithet could have so inflamed the two jurors of color that they were ultimately persuaded to vote for death.

The "profound impact of the n-word" cannot be overstated. *Thomas v. Bronco Oilfield Servs*., 503 F. Supp. 3d 276, 299 (W.D. Pa. 2020). It is "the most noxious

racial epithet in the contemporary American lexicon." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) ("It is beyond question that the use of the [n-word] is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is 'perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry.'") (citation omitted). "Far more" than a "mere offensive utterance," the n-word is "pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001); see also *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 262–63 (E.D.N.Y. 2019) ("The [n-word] evinces a hatred and disgust of African Americans and invokes dehumanizing stereotypes that served to justify centuries of social, economic and political discrimination."); *Mason v. SEPTA*, 134 F. Supp. 3d 868, 875–76 (E.D. Pa. 2015) ("The remark is hardly ambiguous when it comes to racial prejudice, as it has been described as the 'paradigmatic slur' toward African-Americans and the 'most socially consequential insult.'"); *Daso v. Grafton Sch., Inc.*, 181 F. Supp. 2d 485, 493 (D. Md. 2002) ("No word in the English language is as odious or loaded with as terrible a history").

While juries ordinarily are presumed to follow the court's instructions, courts have recognized that in some circumstances "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the

defendant, that the practical and human limitations of the jury system cannot be ignored." *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994) (citing *Bruton v. United States*, 391 U.S. 123, 135 (1968)). Here, the interjection of a racial epithet provided such a circumstance. As a result, Martinez's Eighth and Fourteenth Amendment rights to a fair and reliable capital sentencing were violated.

Interposing race into the delicate calculus the jury undergoes in deciding whether to sentence a person to death or life imprisonment is error. "Relying on race to impose a criminal sanction 'poisons public confidence' in the judicial process. It thus injures not just the defendant, but 'the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts." *Buck v. Davis*, 580 U.S. 100, 124 (2017) (citing *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)) (internal citations omitted).

## <u>PROPOSITION THREE</u>

### THE CUMULATIVE EFFECT OF THE ERRORS PREJUDICED MARTINEZ.

OCCA held that the accumulated effect of the errors at trial did not require relief.[4] To obtain habeas relief on cumulative error, the Court must find "the

---

[4]OCCA found some minor errors, including testimony concerning the racist slur attributed to Martinez, but noted the error was cured at the trial. *Martinez*, 371 P.3d at 1119. As addressed in Proposition Two, *supra*, OCCA failed to address Martinez's right to a reliable capital sentencing procedure resolving the racial epithet claim.

cumulative effect of the errors determined to be harmless had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Because the district court found no errors, it did not consider the synergistic effect of any potential errors in conducting its cumulative review. In *Cargle*, 317 F.3d at 1206-07, this Court mandated a cumulative prejudice review of all errors.

The constitutional violations in Martinez's case, like in *Cargle*, have a "synergistic effect." *Id*. at 1221. The effect of errors pertaining to mitigating and aggravating evidence was compounded due to ineffective assistance of counsel and the jury hearing irrelevant evidence of Martinez using a racial slur. Trial counsel failed to adequately investigate and present Martinez's mother, grandfather, and uncle as witnesses. Under professional guidelines, the three witnesses were readily available and crucial to the defense theories. The error was then amplified by the irrelevant racial slur. Thus, the jury was underinformed on mitigating evidence that would have spared Martinez's life, but it was overinformed on aggravating evidence that painted Martinez as a racist.

The errors in denigrating and reducing mitigating evidence were worsened by the addition of the improper aggravating racial evidence. The jurors should have heard important mitigating evidence explaining and humanizing Martinez and his

83

actions, but instead, they heard inflammatory and racially charged inadmissible evidence. It all served to exacerbate the harm done by the ineffective assistance of counsel, further skewing the balance between aggravation and mitigation. No individual error can be harmless unless it is harmless in context, including in context of other errors. *O'Neal*, 513 U.S. at 437-38. Taken together, the errors had a substantial and injurious effect on Martinez's death sentence.

## <u>CONCLUSION</u>

This Court should reverse the district court and grant sentencing relief. Alternatively, this Court should remand for an evidentiary hearing on Martinez's IAAC claim.

Respectfully submitted,

*s/ Katrina Conrad-Legler*
KATRINA CONRAD-LEGLER, OBA No. 16953
BRENDAN VAN WINKLE, SC Bar No. 104768
VICKI WERNEKE, OBA No. 13441
Assistant Federal Public Defenders
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102
(405)609-5975 – Telephone
(405)609-5976 – Facsimile
Katrina_Legler@fd.org
Brendan_VanWinkle@fd.org
Vicki_Werneke@fd.org
ATTORNEYS FOR APPELLANT
MICA ALEXANDER MARTINEZ

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that with respect to the foregoing Petitioner/Appellant's Opening Brief that: (1) all required privacy redactions have been made pursuant 10th Cir. R. 25.5; (2) the hard copies submitted to the Court via ECF submission are exact copies of the version submitted electronically, and (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, Version 14.000.15.105, updated daily, and according to the program, is free of viruses.

*s/ Katrina Conrad-Legler*
KATRINA CONRAD-LEGLER, OBA No. 16953
Assistant Federal Public Defender

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(g) because this document contains 19,995 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Office 16 in 14-point Times New Roman font.

Dated March 1, 2024.

*s/ Katrina Conrad-Legler*
KATRINA CONRAD-LEGLER, OBA No. 16953
Assistant Federal Public Defender

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of March, 2024, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

> Jennifer Crabb, Assistant Attorney General
> Caroline E.J. Hunt, Assistant Attorney General
> Criminal Appeals Division
> 313 N.E. 21st Street
> Service email: fhc.docket@oag.ok.gov
> Jennifer.Crabb@oag.ok.gov
> Caroline.Hunt@oag.ok.gov

> *s/ Katrina Conrad-Legler*
> Katrina Conrad-Legler, OBA No. 16953
> Assistant Federal Public Defender